Original
No. 86-492.

*In re* NEW HAMPSHIRE DISABILITIES RIGHTS CENTER, INC.

March 10, 1988

*Backus, Meyer & Solomon*, of Manchester (*Jon Meyer* on the brief and orally), for the petitioner.

*Stephen E. Merrill*, attorney general (*Emily Gray Rice*, assistant attorney general, on the brief, and *Monica Ciolfi*, assistant attorney general, orally), for the State.

SOUTER, J. We address a petition to this court filed by the New Hampshire Disabilities Rights Center, Inc. (DRC), an organization existing under RSA 292:1-a, which authorizes the formation of non-profit corporations "for the purpose of providing professional legal services to the poor." *Id.*; *see* RSA 292:1, XV and :2-a. The DRC employs lawyers to provide representation and other legal services to those who are "poor" within the meaning of the statute, and who either claim that their rights and interests have been infringed because they are disabled, or assert rights as disabled persons. While the DRC does not wish to modify its ultimate objective of serving the disabled, its petition seeks our approval to expand the class of its clients to include those who are not poor, although the poor would have priority in obtaining the DRC's aid.

The DRC's request runs counter to applicable State statutes. Despite this conflict, we hold that enforcement of State law to prohibit the DRC, as a non-profit corporation, from representing non-indigent clients in its advocacy on behalf of disabled people would violate the first and fourteenth amendments of the National

Constitution, as interpreted by the Supreme Court of the United States. We accordingly grant the petition.

The DRC's request comes to us in the context of the State's regulation of the practice of law. RSA 311:11 provides, subject to criminal penalties, that "[n]o corporation shall practice or appear as an attorney . . . or hold itself out . . . or advertise as being entitled to practice law." To this broad rule there are two statutory exceptions: (1) corporations for providing legal services may be organized and may operate under the professional corporations statute, RSA chapter 294-A, subject to Supreme Court Rule 41, requiring generally that "[a]ll shareholders, officers and directors of a professional association engaging in the practice of law shall be persons admitted to the practice of law by this court"; and (2) five or more persons, not necessarily lawyers, incorporated under RSA 292:1-a, may provide legal services to the poor, subject to this court's approval after an inquiry into the corporation's personnel, and a review of its articles of agreement and by-laws. *Id.*

The DRC was organized under § 1-a in 1977. Since that time, it not only has served its clients but, in so doing, has satisfied the State's obligation to provide "a system to protect and advocate the rights of persons with developmental disabilities," 42 U.S.C.S. 6042(a)(1) (Supp. 1987), an obligation that arises under federal law when the State accepts money appropriated by Congress to further the interests of the developmentally disabled. *Id.* Consistently with § 1-a, however, the DRC has heretofore been limited to serving developmentally disabled people who were "poor" within the meaning of the State statute.

In 1986, the DRC sought to broaden its corporate purposes, following congressional enactment of 42 U.S.C.S. 10,805 (Supp. 1987), which authorized the States to designate "systems" to act on behalf of mentally ill people receiving care and treatment. The DRC proposed to amend its articles and by-laws so as to qualify to act under that statute as well, and we approved those amendments. (When, therefore, we refer to the "disabled" in this opinion, the term will refer both to those with a "developmental disability" within the meaning of 42 U.S.C.S. 6001(7) and to those who are "mentally ill" within the meaning of 42 U.S.C.S. 10,802(3) (Supp. 1987).)

At the same time, the corporation petitioned for approval of article and by-law changes that would authorize two further expansions of its constituency. First, the DRC argued that services to families with disabled members, and to other associates of the disabled, could inure to the benefit of the disabled individuals

themselves, and the corporation sought authority to broaden the class of permissible DRC clients accordingly. Second, the corporation proposed to act on behalf of those who were not "poor." It observed that neither of the federal funding statutes in question limits its intended beneficiaries to the poor, and that neither statute suggests in any way that the corresponding State "systems" should be so restricted in the objects of their service. The corporation pointed out that sometimes it is wasteful and ineffective to try to serve indigent clients without also serving those otherwise similarly situated but having greater financial resources. And, as a further reason for allowing the corporation to serve non-indigents, the DRC's counsel submitted that the lawyers regularly employed by the corporation are more expert in the applicable law than are most private practitioners, who only infrequently represent clients asserting rights of the disabled.

We did not question the merits of any of these claims, and we approved the requested article and by-law modifications to the extent of allowing the DRC to serve the disabled indirectly through service to their families and other associates. The apparent conflict, however, between the DRC's request and the combined effects of RSA 292:1-a and RSA 311:11 prompted us to set the petition down for hearing insofar as it proposed article and by-law changes that would authorize the DRC to provide legal services to anyone who was not "poor" within the meaning of § 1-a. The attorney general filed an appearance at the court's request, and thereafter objected to the petition on the ground of its inconsistency with the State statutes. We then scheduled briefing and argument on the DRC's alternative positions, questioning the applicability of the limitations imposed by the two statutes cited, and challenging the constitutionality of enforcing those limitations against the DRC. We may add that all counsel have served the court well in addressing the issues thus raised.

We take up the statutory questions first. These are (a) whether a correct application of RSA 292:1-a confines corporations relying on its terms to representing the "poor" alone; and (b) whether, in any event, a proper application of RSA 311:11 would permit the DRC as a non-profit corporation, not organized under RSA chapter 294-A, to provide legal services for the benefit of the disabled, including those who are not poor.

Consideration of the first question needs to begin with the text of RSA 292:1-a, so far as it is relevant here:

"Five or more persons of lawful age may associate together by articles of agreement to form a corporation, without a capital stock, for the purpose of providing professional legal services to the poor [subject to the supreme court's approval]. The actual practice of law by such corporation shall be conducted solely by members of the New Hampshire bar in good standing, and the fact of incorporation shall not in any way be deemed to immunize any attorney employed by the corporation from personal responsibility and liability to the clients whom he serves. The provisions of RSA 311:11 shall not apply to corporations organized under this section."

The DRC maintains that this language authorizes a corporation to represent the poor, but does not limit the corporation to representing the poor alone. The DRC thus assumes that words of authorization are not words of limitation, and that limitations must be expressed.

██ The assumptions are unsound in the instant case, however. Although we will concede that statutory authorizations are not necessarily limitations as well, a look at the statutory context in which § 1-a functions indicates that in this instance the reference to serving the poor was indeed meant to limit corporate authority. As we noted before, § 1-a is one of only two statutory exceptions to the general prohibition against law practice in corporate form as contained in RSA 311:11, which expresses the equally general common law prohibition to the same effect. *See Matter of Co-operative Law Co.*, 198 N.Y. 479, 92 N.E. 15 (1910). Any statutory exception to RSA 311:11 must therefore be treated as an act in derogation of the common law, to be construed no more expansively than its clearly expressed intent. *See Bolduc v. Herbert Schneider Corp.*, 117 N.H. 566, 568, 374 A.2d 1187, 1188–89 (1977). Since § 1-a is just such a statute, and since it expresses no clear intent beyond authorizing service to the poor, its operation must be limited to that.

The DRC speaks to the second question by offering an alternative statutory argument for the approval it seeks. It claims in effect that there is nothing fatal about the failure of RSA 292:1-a to include service to non-indigents within the scope of its exception to the general prohibition of RSA 311:11, because the DRC's proposal would not actually violate the general prohibition itself. Thus the non-profit corporation would have no need to rely on § 1-a, if its

proposed practice would not violate the general rule to which § 1-a provides a limited exception.

Specifically, the DRC argues that under its particular proposal the corporation would not be practicing law within the meaning of RSA 311:11, since one of the DRC's by-laws requires that all "decisions regarding pending cases . . . be made by the responsible attorney, in conjunction with the Supervising Attorney" who has responsibility for a given case. The argument goes that even though all DRC lawyers would be corporate employees, they would retain such professional independence that only they, and not the corporation, could be said to be practicing law or appearing on behalf of a client.

Again, however, the argument falls short. While the DRC's by-law does address one danger underlying the statute, the danger survives the by-law and, even if that were not so, the statute is not amenable to the exception that the DRC tries to read into it.

The danger in question is that, in legal practice by a corporation managed in part by non-lawyers, decisions affecting representation could be influenced or dictated by individuals who are themselves beyond this court's disciplinary authority to enforce the lawyers' binding ethical obligations to their clients. *See Petition of N.H. Bar Ass'n*, 110 N.H. 356, 357, 266 A.2d 853, 854 (1970). To be sure, the DRC by-law tends to mitigate this danger by calling for lawyers to make all "decisions regarding pending cases." But a tendency to mitigate the danger does not eliminate that danger, and not even the best intended by-law is self-executing. Since a by-law's force is no greater than the readiness of corporate directors to enforce it, we can hardly suppose that the legislature intended a corporation to acquire immunity from the statutory prohibition by the mere adoption of a by-law. If, indeed, this were enough to avoid the statute, every corporation desiring to market legal services would have its immunizing by-law, and the statute would be a dead letter overnight.

It is not surprising, therefore, that the legislature has already rejected the argument that a corporation does not practice law in violation of the statute when an "independent" corporate employee provides legal services to a third party on the corporation's behalf. We may recall that RSA 292:1-a provides both that "[t]he actual practice of law by such corporation shall be conducted solely by members of the . . . bar," and that the prohibition of "RSA 311:11 shall not apply to [such] corporations . . . ." Thus, even though the legislature assumed that lawyers acting for a § 1-a corporation would exercise the independence that the DRC seeks to guarantee

by its by-law, the legislature still found it necessary to except the corporation from the scope of the RSA 311:11 prohibition. Since the legislature is presumed not to enact useless language, *Trustees &c. Academy v. Exeter*, 92 N.H. 473, 482, 33 A.2d 665, 671 (1943), we have to read these provisions together as indicating that whenever a corporate employee furnishes legal services to a corporate customer, however independent the employee's judgment may be, the corporation is as a matter of law providing legal services in the manner that RSA 311:11 generally prohibits.

██ In sum, when a corporation's employees, acting within the scope of their authority, provide legal services to the corporation's clients or customers, the corporation practices law. This is a crime unless the corporation is a professional legal corporation conforming both to RSA chapter 294-A and to the rules of this court, *see* RSA 294-A:20, or unless it is a non-profit corporation conforming to RSA 292:1-a. Since a corporation organized under RSA 294-A:20 and Supreme Court Rule 41 may not include lay members, and because a non-profit corporation may not qualify under RSA 292:1-a unless it is limited to serving the poor, the DRC's petition may not be granted consistently with the applicable statutes.

Given these statutory bars to granting the DRC's petition, we now consider the further question whether a non-profit corporation organized to serve the disabled may claim a constitutional warrant to operate independently of the statutory limitations. The DRC claims that enforcement of RSA 311:11 so as to preclude such service to the non-indigent would offend both the first and the fourteenth amendments of the Constitution of the United States, as well as articles 22 and 32 of part I of the Constitution of New Hampshire.

We need not pause for long over the State claim. Although the DRC has cited two State constitutional articles in one heading of its brief, the citations come to us without any supporting argument or further reference that might be thought to develop a position on independent State grounds. Because the State claim is thus left unexplored, it is not properly before us for decision. *See State v. Bradberry*, 129 N.H. 68, 522 A.2d 1380 (1986).

The claim under the first and fourteenth amendments is substantial, however, resting as it does on a trilogy of cases beginning with *N.A.A.C.P. v. Button*, 371 U.S. 415 (1963). *Button* arose on a suit to enjoin the application of a Virginia statute banning improper solicitation of legal business. As construed by the State courts, the statute would have proscribed the NAACP's practice of advising potential litigants, not necessarily members of

the organization, to seek the assistance of particular lawyers, *id.* at 433, who happened to be on the NAACP staff and paid by the organization to represent plaintiffs in civil rights actions. *See id.* at 420–23. The Supreme Court of the United States observed that the NAACP's activities were not motivated by private gain, *id.* at 443, 457 (Harlan, J., dissenting), and held that enforcement of the statute to curtail the organization's practices would violate a right of the NAACP, its affiliates and its lawyers, guaranteed by the first amendment and enforceable against the States through the fourteenth. *Id.* at 428–29. The right was described as one of expression and association for the purpose of assisting people seeking legal redress for infringements of constitutional and other rights, *id.*, although the Court was careful to point out that the NAACP's opponents could claim comparable associational protection. *Id.* at 444. The Court treated litigation directed to such redress as a form of advocacy protected as a mode of political expression. *Id.* at 429.

*Button* was followed by *Railroad Trainmen v. Virginia Bar*, 377 U.S. 1 (1964), recognizing even broader first amendment protection against the enforcement of anti-solicitation and unauthorized legal practice statutes. The State had obtained an injunction that would, among other things, have barred a labor union from recommending that its members, or their survivors, take workers' compensation claims to particular lawyers thought to be competent and willing to charge reasonable fees. This application of the statute was held to infringe the union members' first amendment rights to associate together and receive advice and assistance in obtaining remedies they were entitled to claim under statute, *id.* at 8, and the right of association was said to be broad enough to protect the interests both of the union members and of the lawyers who obtained clients and cases on the union's recommendation. *Id.* The opinion indicated that the referrals were not recompensed by fee-sharing, *id.* at 5 n.9, and distinguished the union's practice from "ambulance chasing" and from anything that could be described as "commercialization" of the legal profession. *Id.* at 6.

After *Trainmen* came *Mine Workers v. Illinois Bar Ass'n*, 389 U.S. 217 (1967). Here again the Court recognized an organization's first amendment associational right, *id.* at 221–22, in holding that the State's unauthorized practice statute could not be enforced to prevent a labor union from itself employing and paying a lawyer to litigate its members' workers' compensation claims, when neither the union nor the lawyer received a portion of any recovery obtained. *Id.* at 221.

Although the opinions in *Button, Trainmen* and *Mine Workers* do not carry identical conceptual statements of the protected first amendment right, the Supreme Court has held that the cases' "common thread . . . is that collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment." *United Transportation Union v. Michigan Bar*, 401 U.S. 576, 585 (1971). And while that statement of common principle has not eliminated disagreement over its application, *compare Ohralik v. Ohio State Bar Ass'n.*, 436 U.S. 447, *reh'g denied*, 439 U.S. 883 (1978), *with In re Primus*, 436 U.S. 412 (1978), *and id.* at 440 (Rehnquist, J., dissenting), the salient features of the *Button* line of cases are adequate indications of the decision they require on the facts before us now.

■ Organizations, their members and their staff lawyers may assert a protected first amendment right of associating for non-commercial purposes to advocate the enforcement of legal and constitutional rights of those members, or of others within a definite class whom the organization exists to serve. When such advocacy may reasonably include the provision of legal advice or take the form of litigation, the organization may itself provide legal representation to its members or beneficiaries despite State regulations restricting legal practice and the solicitation of clients, provided that the organization and its lawyers do not engage in the specific evils that the general State regulations are intended to prevent.

The entitlement of the DRC, its members and its legal staff to exercise such an associational right is apparent. The DRC is an organization of lay people and lawyers associated together not for commercial gain, but to advance the interests of the disabled by means that include resort to litigation. Like the union in *Mine Workers*, the DRC pays staff lawyers to provide representation to individual clients. To the extent that the combined effects of RSA 292:1-a, RSA 294-A:20, Supreme Court Rule 41, and RSA 311:11 would confine the DRC's lawyers to advising and representing only the poor, State law would limit the pursuit of a protected associational interest, just as the enforcement of State regulations on legal practice would have thwarted the union's exercise of a first amendment right in *Mine Workers*. And just as the NAACP could assert the associational right in *Button,* and the unions could assert it in *Trainmen* and *Mine Workers,* so the DRC is entitled to obtain this court's recognition of the comparable rights of its members to serve, and of its staff lawyers to represent, all economic classes of the disabled who will place their legal interests in the DRC's hands.

As against this apparent showing of entitlement under the first amendment, the State presses three arguments for enforcing RSA 311:11 to the extent of barring the DRC from representing non-indigents: (1) there is no reason to assume that without DRC representation the non-indigent disabled will be denied legal services or access to the courts; (2) the DRC is free to accomplish its objectives consistently with RSA 311:11 by referring non-indigents to fee-charging lawyers; and (3) State interests justify the application of RSA 311:11 against the DRC, even on the assumption that a first amendment interest may be infringed thereby.

The controlling federal authority renders these arguments untenable. Our response to the State's first position, that those who are not poor can hire lawyers even if the DRC can not serve them, rests on the holdings of *Trainmen* and *Mine Workers*, in neither of which cases would counsel have been unavailable without the union's service, and in neither of which would the beneficiaries of the association's activities have otherwise suffered a complete denial of access to the courts. In each instance, the clients to be served had claims to fee-generating judgments, and counsel were ready to take their cases. The unions were not responding to any unavailability of counsel, *per se*, but to the inadequacies of the representation that was at hand. Thus it was the improvement of legal services, not the provision of services where there would have been none at all, that was held to be a constitutionally cognizable objective, served by the referral service in the one case and the salaried lawyer in the other.

Because the DRC rests its constitutional position on a comparable objective of improved legal services, *Trainmen* and *Mine Workers* are controlling here. The State does not dispute the DRC's claims that its lawyers are more conversant in the relevant law than are most lawyers practicing privately, and more eager to accept cases likely to result in vindicating the rights of the disabled. It is therefore reasonable to take it as true for purposes of this proceeding that granting the DRC's petition will probably result in better representation and readier access to the courts for the non-indigent, and more effective service to all the disabled whose interests the DRC is organized to advance. The DRC must therefore be treated just as the unions were treated in *Trainmen* and *Mine Workers*.

To keep some perspective, however, it is probably well to note also that none of the federal authorities we have cited recognized an associational right to provide mere duplication of legal services on the same terms generally available. Whether there is any

significance in this observation we do not, and need not, say. On the one hand, it is arguable that because the right to provide legal services is an incident of first amendment protection derived from rights of expression and association, *see Button*, 371 U.S. at 428, the right should not be affected by the availability of other providers. But it is also true that those cases recognizing a first amendment right to litigate have done so in instances where representation would otherwise have been virtually unavailable, as in *Button*, or would have been second-rate and unreasonably expensive, as in *Trainmen* (the rationale of which was applied along with that of *Button* in *Mine Workers*, 389 U.S. at 223). In any event, it is enough to say here that the DRC does not propose merely to duplicate what is readily available, and we do not here decide that it would be constitutionally privileged to do so in derogation of State law.

The State's second position, too, runs afoul of controlling authority. Even if it is factually true that the DRC could accomplish its stated objectives simply by referring non-indigent plaintiffs to independent private counsel, the same argument was made and rejected in *Mine Workers*. 389 U.S. at 224–25. Although the union in *Mine Workers* could have run a referral service instead of providing salaried employees, the provision of salaried employees was held to be within the scope of the protected associational activity. *Id.* at 221–22. The same result must obtain here.

The State's third position, with its emphasis on the public interest in regulating the practice of law, is likewise unavailing, although it calls for a more extended response. The DRC does not, of course, question the State's authority, acting through this court, to regulate legal practice. Nor does the DRC generally question the reasonableness of forbidding a corporation to provide legal services unless all of its shareholders, officers and directors are people admitted to practice law. *See* RSA 311:11; RSA 294-A:20; SUP. CT. R. 41. As we observed before, this requirement is imposed to preserve a lawyer's capacity for legitimate professional loyalty to his client, *see Petition of N.H. Bar Ass'n*, 110 N.H. at 357, 266 A.2d at 854, by ensuring that everyone in the corporation capable of influencing the lawyer will share the same professional obligation to serve the client. To the same end, the requirement in question preserves this court's capacity to enforce professional discipline directly against those individuals occupying the best positions to influence lawyers who practice in the corporate form, or who work for those who do. *Id.*

The DRC simply maintains that the general requirements, as sound as they may be, must yield to first amendment values when their enforcement is unjustified by any specific and immediate threat of the evils the requirements are intended to insure against. Such, indeed, has been the general rule ever since the Supreme Court of the United States held in *Button* that any encroachment on the first amendment associational interest must be supported by a "compelling" justification. 371 U.S. at 439. The Court in *Trainmen* alluded somewhat obliquely to this rule when it noted that the union's referral service involved no "commercialization," or "ambulance chasing," 377 U.S. at 6, and *Mine Workers* affirmed the same point when the Court explained that infringement of a first amendment interest could not be justified even on a showing that the State regulation in question was generally "helpful" in eliminating an evil within the State's power to proscribe. 389 U.S. at 222. The threat of the evil must, in other words, be concrete and immediate before it can justify enforcement of State restrictions that impinge on first amendment interests.

As against this stringent requirement, the argument for enforcing RSA 311:11 against the DRC just does not measure up. While the State posits the danger that a DRC staff lawyer could be influenced by sentiments of the DRC's officers or directors in derogation of his client's interests, this is not enough to meet a challenge grounded in the first amendment.

We do not, to be sure, regard the State's argument as trivial, and we accept it as a justification for viewing our own Rule 41 as a reasonable means to accomplish an objective within the State's general constitutional competence. But the Court in *Mine Workers* held that the general possibility of conflicting interests between the association and the individual client is too speculative to support enforcement of an otherwise valid State regulation, when enforcement would compromise a demonstrated first amendment interest. 389 U.S. at 224. We take that holding to be dispositive in the case before us.

We conclude, therefore, that the DRC has made an adequate showing that its members and employees have an associational right under the first amendment to engage in advocacy on behalf of the disabled, and that their advocacy may take the form of paying staff lawyers to provide legal services for the benefit of disabled people, whether or not the clients are poor within the meaning of RSA 292:1-a. There being no "compelling" justification, a recognition of the first amendment right precludes enforcement

340

of RSA 311:11 so as to prevent the DRC from providing legal services to the non-indigent.

We do not, of course, hold that the State is affirmatively required to provide any legal services to the disabled, or required to fund services provided to the disabled who are not poor, since neither issue was raised in this proceeding. Nor did the State argue that the DRC's proposed practice of collecting fees from the non-indigent who are ready and willing to pay would carry the DRC into a commercial arena outside the scope of the first amendment protection we have discussed. Suffice it to say that the DRC does not propose to require the payment of a fee even from an affluent disabled client, and we do not here have occasion to pass on the significance of a fee-for-service requirement.

The petition for amendment to the DRC's articles of agreement and by-laws is granted.

*Petition granted.*

All concurred.