Merrimack County Probate Court
No. 87-112

*In re* ALLEN SANBORN

May 6, 1988

*Stephen E. Merrill*, attorney general (*Stephen J. Judge* and *David S. Peck*, assistant attorneys general, on the brief, and *Mr. Peck* orally), for the State as petitioner.

*Epstein, Burke, MacIntosh & Devito P.A.*, of Concord (*John D. MacIntosh* on the brief and orally), for the respondent.

SOUTER, J. The State appeals an order of the Merrimack County Probate Court (*Cushing, J.*), which dismissed a petition for involuntary civil commitment on the alternative grounds that the respondent was mentally retarded but not mentally ill within the meaning of RSA 135-C:34 (Supp. 1987), and that the State had failed to prove beyond a reasonable doubt that the respondent posed "a potentially serious likelihood of danger . . . ." *See id.* We reverse because the trial court erroneously suppressed evidence of the respondent's statements to the police, and because *Proctor v. Butler*, 117 N.H. 927, 935, 380 A.2d 673, 677–78 (1977) must be overruled insofar as it imposed a reasonable doubt burden of proof in civil commitment cases. In place of that rule, we hold that mental illness and dangerousness, as predicates for civil commitment under RSA 135-C:34, may hereafter be demonstrated by clear and convincing evidence.

## I.

On September 26, 1985, the respondent, Allen Sanborn, telephoned an acquaintance, whom he asked to call for him by car later in the day at the respondent's uncle's camp in Sandown. Some time

thereafter, the respondent informed the police that his uncle was missing from his camp and made a number of telephone calls seeking the whereabouts of the missing man. When the town fire chief went to the camp to investigate on September 29, he found the uncle's naked body in a well on the property. A pathologist concluded that death had occurred several days before, and an autopsy revealed a broken neck, crushed chest, injured abdomen, and severe lacerations of the liver and spleen, together with extensive post-mortem burning of the eyes, nose, lips, mouth, upper chest, neck, and arm. The left hand and forearm were burned away completely.

On September 30, the respondent met with three State police officers investigating his uncle's death, one of them dressed in uniform and two in plain clothes. He invited them into the kitchen of his house and served coffee as they asked him for information about the dead man. The officers did not reveal that the body had been found, but told the respondent only that they were seeking information about his uncle's disappearance. The respondent told the police that his uncle had once said that on his death certain of his real and personal property would go to the respondent, and he admitted that during a recent meeting with his uncle the two of them had argued.

After some further discussion, the police made a point of advising the respondent that he was not under arrest, was free to leave, and was free to end the conversation, although shortly thereafter one of the officers read and explained the *Miranda* warnings. The respondent indicated that he understood his rights but "want[ed] to tell the truth so [he could] feel better about what [he had] done." He added that he hadn't "been able to sleep since it happened, and want[ed] to tell the truth." He then said that he had fought with his uncle, whom he had pushed into the well in the course of the fight. Later, he stated that he had pressed his uncle's body against the hot furnace at the camp and had even tried to shove the body into the furnace, before carrying it outside and throwing it down the well.

After making these admissions, the respondent agreed to record his story on tape at the State police barracks, although the police advised him that he was not required to do so. After they had all stopped for lunch at a McDonald's restaurant, they went to the troop headquarters, where the respondent recorded answers to questions about his personal life, and repeated the admissions incriminating him in his uncle's death.

After the respondent's statements had been taped, the police again gave him *Miranda* warnings, and this time he requested a lawyer. The State offered to prove at trial that in a conversation with a minister later that same afternoon the respondent admitted that the police had told him he did not have to talk with them or go to the police station. He told the minister that he should have said nothing.

Although the respondent was charged with second degree murder, some fourteen months after indictment he was found incompetent to stand trial. He then filed an application for habeas corpus challenging any further confinement, *see Sanborn v. Powell* (Rockingham No. 86-E-682), to which the deputy attorney general responded on behalf of the State by filing a petition in the probate court for the respondent's involuntary civil commitment on the ground of mental illness posing a danger to others. *See* RSA 135-C:34.

Prior to the evidentiary hearing on the petition, the State moved for a determination that its burden to prove mental illness and dangerousness would be measured by the standard of clear and convincing evidence, as distinguished from the reasonable doubt standard imposed by *Proctor v. Butler*, 117 N.H. at 935, 380 A.2d at 677–78; *see In re Champagne*, 128 N.H. 791, 792–93, 519 A.2d 310, 311 (1986). The court made no ruling on the motion, and the parties proceeded to trial.

The State opened its case by calling two psychiatrists who testified that the respondent was mentally ill and dangerous. They based their opinions on personal examinations and on records compiled during the respondent's prior admissions to New Hampshire Hospital. At least one of the doctors also relied on the results of psychological tests administered in anticipation of trial or hearing, and on statements of the police officers who had interviewed the respondent and heard him admit to killing his uncle and attempting to hide the corpse. Although the psychiatrists' expert opinions were received into evidence, the judge sustained the respondent's objection to any testimony from them about the admissions, which at least one of them had considered in reaching his conclusion. The State brought the first day of hearing to a close by introducing evidence that the respondent had been at his uncle's camp at about the time of death, and that he customarily expressed his aggressive feelings by squeezing and crushing the object of his anger.

The State indicated that it would present the police officers themselves to testify about the admissions, but before the second day of trial the respondent moved to suppress all evidence of the

statements he had made to the police, on the ground that they were involuntary and inadmissible under a standard of due process of law. In response to the motion, the probate court heard the beginning of the audiotape of the respondent's description of personal experiences, but the court refused to listen to the portion of the tape containing the admissions of homicide.

The judge did, however, hear extensive testimony from two further witnesses about the respondent's mental condition. The State called a third psychiatrist, who based his opinions on a personal interview with the respondent; on records and reports prepared by two other psychiatrists, a psychologist and the staff of New Hampshire Hospital; and on the audiotape and a videotape of the respondent's statements at the police barracks. The psychiatrist concluded that the respondent was able to perceive, understand, and recall events, and was able to make a genuine choice to give or refuse answers to questions. His opinion was that the respondent's statements to the police were products of a "meaningful choice and . . . a rational intellect." He went on to testify on the merits of the petition by agreeing with the two psychiatrists who had preceded him that the respondent was dangerously mentally ill. Although this witness was allowed to testify that the respondent had told him of his admissions to the police, he also repeated the respondent's statement to him that the admissions had been false and that he had been at home with his mother at the time of his uncle's death.

The psychologist whose report had previously been considered testified otherwise, however, after being called by the respondent. The psychologist based his conclusions on his own examination of the respondent, on psychiatric and hospital reports, and on the audiotape of the respondent's statements. He concluded that the respondent had a limited memory and a second or third grade verbal capacity, and he gave an opinion that the respondent could not rationally choose between talking and silence, although he conceded that the respondent could make a voluntary choice between the two options. The psychologist, too, proceeded to testify on the merits of the petition, but his testimony again ran contrary to the evidence given by the three psychiatrists who had preceded him. He gave an opinion that the respondent's mental condition was "primarily caused by mental retardation . . . in conjunction with epilepsy" (with the consequence that it could not be regarded as mental illness within the meaning of RSA 135-C:34, see RSA 135-C:2, X (Supp. 1987)).

The court then granted the motion to suppress the admissions, relying on the psychologist's testimony indicating the respondent's "lack of ability to understand." When State's counsel asked whether the court had found any police coercion, the judge responded that he rested the ruling primarily on the respondent's inability "to appreciate his situation," but that "the coercion would take the form of taking advantage of somebody with a lack of skills . . . . [T]his court doesn't really feel that . . . he had a fair shake. So, there is certainly no evidence of the police browbeating him, but there is certainly evidence of a more subtle form of coercion."

Thereafter, the court received further lay testimony buttressing the psychiatrists' opinions. Several witnesses gave evidence that the respondent had threatened, attempted to strike and to bite, and had actually fought with members of the staff of the psychiatric unit in which he had been confined, and a member of the staff testified that on one occasion some sharp steel rods had been confiscated from the respondent.

In ruling on the merits of the petition, the court again accepted the psychologist's testimony and found that the respondent's behavior was not the result of "mental illness" within the meaning of RSA 135-C:34. The judge stated from the bench that "the real problem is mental retardation." Having noted, further, that the State had failed to prove dangerousness beyond a reasonable doubt, he dismissed the petition for commitment. This appeal followed.

## II.

We consider first the suppression of the respondent's admissions, a ruling of obvious evidentiary significance. The facts that the respondent killed his uncle in the course of some quarrel and attempted first to incinerate and then to secrete his corpse were signal indications both of dangerousness and of a mental condition that could not be described merely as retarded. See RSA 135-C:36, I(b) (Supp. 1987). Without the respondent's admissions, however, there was only circumstantial evidence of his role in the homicide. Nor was the significance of the admissions limited to their narrative content, for evidence of the respondent's behavior in making them, and even the phrasing of his statements, could have provided the probate court with further indications of the respondent's mental condition.

Because the evidentiary relevance of the admissions is thus clear, they are subject to the general rule that "[a]ll relevant evidence is admissible, except as limited by constitutional requirements or as otherwise provided by statute" or rule. N.H. R. Ev. 402. There is

no suggestion that any statute or rule forbids receipt of the respondent's statements, and we are therefore left to ask whether any constitutional basis exists for suppression. The probate court expressed none, and none is apparent from an examination of the court's factual conclusions.

The court, it will be recalled, rested the suppression on a finding that the respondent had not had a "fair shake." While the judge found there had been no coercion in the sense of "browbeating," he believed that the respondent's failure "to appreciate his situation" opened the door to a more subtle coercion in the "form of taking advantage of somebody with a lack of skills . . . ."

As we read these observations, we do not understand the court to be suggesting that the respondent's intellectual limitations had any effect on the evidentiary reliability of the admissions, insofar as they might bear on the matters in issue in this civil commitment proceeding. Nor do we understand the court to say that the police tricked the respondent either by suggesting admissions that he was too ready to adopt, or by manufacturing tensions that placed the respondent on the spot. Rather, the court simply seems to be saying that the respondent's lack of sophistication placed him at a tactical disadvantage in any communication with the police, such that he talked when a more prudent murder suspect would have kept silent. Taking an unfair advantage, then, consisted of giving the respondent the opportunity to say whatever he might choose to say.

Since these findings suggest no obvious basis for suppression, we must, in the absence of cited authority, evaluate the soundness of the order in light of the respondent's several arguments in support of the result that the trial court reached. These arguments invoke both State and federal authority.

At the outset we conclude that the respondent has not adequately addressed the question of State constitutional law on which a decision might turn. Whether there is a category of statements by a respondent in a civil commitment proceeding that should be excluded from evidence as involuntary comprises two complementary issues, the meaning of voluntariness in a civil context, and the reasons, if any, for excluding a statement that is not voluntary in that sense. The respondent has not directly addressed either issue.

Although the suppression motion and the respondent's brief refer to the "due process clauses of the United States and New Hampshire Constitutions," the only State law authorities cited stand for applications, not directly in point here, of the uncontested proposition that the guarantee of due process when liberty is at stake applies in a civil as well as in a criminal context. *See In re*

*Brown,* 126 N.H. 309, 312–13, 493 A.2d 447, 450 (1985); *Opinion of the Justices,* 123 N.H. 554, 559, 465 A.2d 484, 488 (1983); *Proctor v. Butler,* 117 N.H. at 932–33, 380 A.2d at 676; *see also In re Miller,* 98 N.H. 107, 108–09, 95 A.2d 116, 117 (1953). While the respondent thus correctly argues that the potential deprivation of liberty inherent in a civil commitment proceeding subjects that proceeding to the demands of due process, that is not the issue here; the question is what "process" is due, and the potential curtailment of liberty does not of itself answer the question. *See In re Brown supra.*

Once, however, the respondent narrowed his focus to the result he seeks in this case, he rested his pleadings in the probate court exclusively on criminal cases, all of them applying federal standards, save for *State v. Damiano,* 124 N.H. 742, 746–47, 474 A.2d 1045, 1047–48 (1984), upon which he also relied in his brief. Neither *Damiano* nor the federal cases, however, address the relevant questions about the significance of voluntariness in this civil context. Since neither the respondent's argument nor his citations address those questions, his pleadings and brief have not crossed the line dividing passing references to State issues from analysis calling for adjudication on independent State constitutional grounds. *See In re N.H. Disabilities Rights Center, Inc.,* 130 N.H. 328, 541 A.2d 208 (1988); *State v. Bradberry,* 129 N.H. 68, 522 A.2d 1380 (1986).

 Two arguments said to rest on federal authority remain. The first of these, like the State claim, requires little discussion. In addressing the probate court, the respondent invoked the fifth amendment privilege against compelled self-incrimination. Although his brief before us likewise refers to the same provision (as well as to its counterpart in part I, article 15 of the State Constitution, *see State v. Arsenault,* 115 N.H. 109, 112, 336 A.2d 244, 246 (1975)), the respondent virtually concedes that the fifth amendment privilege from compulsion to be a witness against one's self "in any criminal case" has no bearing on the admissibility in a civil commitment proceeding of a statement already given. *See State v. Hudson,* 121 N.H. 6, 12, 425 A.2d 255, 258 (1981) (commitment proceeding is civil, not criminal). While the civil nature of a proceeding does not preclude an assertion of the privilege in response to a question arising in the course of it, *In re Gault,* 387 U.S. 1, 49 (1967); *see State v. Mercier,* 128 N.H. 57, 62, 509 A.2d 1246, 1249 (1986), once a statement has been made the fifth amendment privilege can limit the subsequent evidentiary use of that statement only in a proceeding that is criminal in nature, which this is not.

The respondent's final position in support of suppression falls under the rubric of the fourteenth amendment's due process clause. Before the trial court and before us, he has argued that federal due process forbids receipt of the admissions because the State failed to show they were voluntary and because their use as evidence would violate the standard of fundamental fairness.

Before going any further, we should say that the respondent's purpose in relying on the fundamental fairness mandate in addition to the standard of voluntariness is not immediately clear to us. While some criminal cases applying federal due process speak of the fundamental unfairness of admitting a statement that was involuntary because it was obtained by trickery or deception, *Moran v. Burbine*, 106 S. Ct. 1135, 1147–48 (1986); *South Dakota v. Neville*, 459 U.S. 553, 565–66 (1983), other cases have found a violation of the fundamental fairness standard in admitting any involuntary confession, even though trickery was no inducement for the defendant to speak, *see Blackburn v. Alabama*, 361 U.S. 199, 210–11 (1960); *see also State v. Reynolds*, 124 N.H. 428, 432, 471 A.2d 1172, 1174 (1984). The invocation of fundamental fairness to suppress a confession does not, therefore, necessarily imply a claim that governmental deception induced the statement in question.

Suffice it to say that on the facts of this case it would not be realistic to view the respondent's fundamental fairness argument as raising any issue of police trickery, for the record discloses no basis to claim that the police engaged in any deceptive practice that could be thought to have circumvented the respondent's will. While the police did not initially tell him they had found his uncle's body, there is no reason to assume that they thereby induced him to speak when he would otherwise have been silent, or encouraged him to disclose anything that he did not genuinely volunteer. We read the respondent's reference to fundamental fairness, therefore, as just another way to seek the suppression of his admissions as involuntarily given, not as a claim that they were deceitfully obtained.

As so understood, however, the position that the admissions were subject to suppression as involuntarily given is untenable. We do not rest this conclusion simply on the fact that this is a civil proceeding to assess the need for confinement as a requirement of safety, rather than a criminal trial begun by the State with the object of punishing a wrongdoer (although, as we noted, every federal due process case the respondent cited in the probate court for the exclusion of an involuntary confession was a criminal case in which the confession was offered to prove the defendant's guilt). *See, e.g., Culombe v. Connecticut*, 367 U.S. 568 (1961); *Rogers v.*

*Richmond*, 365 U.S. 534 (1961); *Blackburn v. Alabama supra; State v. Portigue*, 125 N.H. 352, 481 A.2d 534 (1984); *State v. Reynolds supra*. Nor do we base our reasoning on the distinctions carefully drawn by the Supreme Court of the United States between the due process requirements of criminal trials and the process due in proceedings to commit for mental treatment. *See Jones v. United States*, 463 U.S. 354, 366–68 (1983); *Addington v. Texas*, 441 U.S. 418, 427–31 (1979). Despite the differences recognized between the two classes of cases, the Court has never held that the due process guarantee of an accusatory system, which precludes the use of involuntary confessions to prove guilt, *Rogers v. Richmond, supra* at 540–41, should not be applied to commitments for mental treatment, which carry their own risks of abuse in a bureaucratized society. We can not reasonably infer, therefore, that federal standards of confessional admissibility in criminal cases can have no application by analogy in the present context, at least when a statement is offered for the purpose of proving a past act.

It is, rather, on the very assumption that evidentiary use of his admissions is governed by standards of voluntariness akin to those applied in criminal cases that the respondent goes astray in trying to portray his admissions as involuntary in a constitutional sense. To understand his error, one need look no further than his counsel's repeated assertions to the trial court and to us that his client's cognitive deficiencies preclude any finding that the admissions were products of a "rational intellect" or of "free will." For he thereby implicitly argues that due process bars a respondent's admissions unless his intellect reaches some threshold of intelligence and unless his volition rests on the analytical capacity identified with intelligence of that degree.

■■■ This argument, however, cannot withstand the most recent leading federal case on this subject of fourteenth amendment due process, upon which the State relied in the probate court and which squarely holds against the respondent. In *Colorado v. Connelly*, 107 S. Ct. 515 (1986), the Supreme Court rejected the position that a schizophrenic defendant's confession induced by "command hallucinations," *id.* at 519, was for that reason subject to suppression as involuntary under the fourteenth amendment. *Id.* at 519–22. The Court summarized a half century of its opinions, including the leading cases cited in the respondent's suppression motion, in support of its holding that an inquiry into a confessor's mental condition can never be dispositive in applying the constitutional concept of voluntariness, *id.* at 520–21. For in the absence of some overreaching official conduct that produces the

confession, there is no State action and, consequently, no violation of the fourteenth amendment. Unless, then, the official conduct is coercive (or, we will assume, deceptive, *see Moran v. Burbine*, 106 S. Ct. 1135, 1147–48 (1986)) when considered in relation to the confessor's mental condition and capacity, and unless the coercion or deception induces the confession by overbearing or circumventing the confessor's will, there are no grounds to treat the confession as anything but voluntary for fourteenth amendment purposes. *Connelly, supra* at 520–22. Although proof of a deranged or deficient mental state may be highly significant in determining whether any given police conduct was overbearing in its effect, mere proof that a confession or admission was the product of a defendant's mental derangement or mental deficiency is no basis to exclude the confession or admission from evidence against a criminal defendant or, on our assumption, from evidence offered in support of a petition for involuntary civil commitment. *Cf. Colorado v. Spring*, 107 S. Ct. 851 (1987) (standards for waiver of right to silence).

Given the need, then, to find some deceptive or coercive governmental action as a predicate for excluding the respondent's admissions, their exclusion was error. As we noted before, while the police did not immediately tell the respondent that his uncle's body had been found, they did not thereby inveigle him into making inculpatory statements and in fact left him perfectly free to persist in professing ignorance of what had happened. As for coercion, the trial court was candid to say that the police did nothing to "browbeat" the respondent. And if we assume with the Supreme Court of the United States that there is something inherently coercive in any guilty person's conversation with a police officer, *see Oregon v. Mathiason*, 429 U.S. 492, 495 (1977), that effect could only. be viewed as de minimis during a conversation with police officers, only one of whom was in uniform, sitting at the respondent's kitchen table at his own invitation.

The trial judge did, of course, find a "subtle form of coercion" in "the form of taking advantage of somebody with a lack of skills." But this is to equivocate. There simply was nothing coercive in asking what the respondent knew about a disappearance that he himself had brought to the police's attention, nor are there any apparently coercive circumstances in sitting at a kitchen table drinking coffee. The police did nothing to deny the respondent a "fair shake."

■ We conclude, then, that under the standard summarized in *Colorado v. Connelly*, 107 S. Ct. 515, 520–22 (1986), which the State's lawyer brought to the attention of the trial court and opposing counsel, there was no evidentiary basis to suppress the admissions on grounds of fourteenth amendment due process. We should also add that we have not forgotten the Supreme Court's observation in *Connelly*, that there may well be grounds of probative unreliability for excluding a statement under State law, regardless of its admissibility under the fourteenth amendment. But the trial court found nothing in the circumstances that might raise a question about the reliability of the admissions, and we see nothing in the evidence about the respondent's mental condition that might give rise to such an issue. In sum, it was error to suppress the admissions.

### III.

We turn now to the second substantive issue, the appropriate burden of proof that the State or other petitioner must satisfy in demonstrating that a respondent in a civil commitment proceeding under RSA 135-C:34 (Supp. 1987) is a "person in such mental condition as a result of mental illness as to create a potentially serious likelihood of danger to himself or to others." *Id.* Although the State requested the probate court to order commitment if it drew the requisite statutory conclusions with a clear and convincing degree of assurance, the court held the State to a reasonable doubt standard, as mandated by *Proctor v. Butler*, 117 N.H. at 935, 380 A.2d at 677–78. While the court was, of course, correct in following the existing law, we are satisfied that *Proctor*'s holding establishing the burden of proof must be overruled and that the clear and convincing standard must hereafter be employed in civil commitment cases.

■ The burden of proof allocates the risk of error, as we noted in *Proctor* when we quoted Justice Harlan's explanation that the function of the standard is "'to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.'" *Id.* at 932, 380 A.2d at 676 (quoting *In re Winship*, 397 U.S. 358, 370 (1970) (Harlan, J., concurring)). Thus in the typical civil case proof by a preponderance is thought to be satisfactory because "a mistaken judgment for the plaintiff is no worse than a mistaken judgment for the defendant." C. McCormick, Evidence § 341, at 962 (3rd ed. 1984). At the other end of the spectrum, the liberty that may be subject to punitive

loss in a criminal case is valued highly enough to demand as a matter of due process that the State carry its burden of proof beyond a reasonable doubt. *In re Winship, supra* at 364. And this court came to an identical conclusion in *Proctor v. Butler supra* when it allocated the risk of an erroneous determination of need for commitment and mental treatment.

*Proctor* imposed the reasonable doubt standard for two reasons. First, the court saw no significant distinction between the loss of liberty and the stigmatization imposed by civil commitment, on the one hand, and the consequences of incarceration for crime, on the other. *Id.* at 932–33, 380 A.2d at 676. The court's conclusion that a comparable loss of liberty should rest on a comparable factual certainty was underscored by a second feature of civil commitments, the trial court's normally heavy reliance on disputed psychiatric opinion evidence about the significance of a respondent's actions in revealing his present condition and likely future behavior.

> "If anything, the predictive nature of the ultimate finding and the frequently conflicting opinions of psychiatric experts, *see People v. Burnick*, 14 Cal. 3d at 326–31; Diamond, *The Psychiatric Prediction of Dangerousness*, 123 U. Pa. L. Rev. 439, 451 (1975), reinforce our determination to impose a standard of proof that will ensure the utmost care in reaching an involuntary commitment decision. *See* Szasz, *The Danger of Coercive Psychiatry*, 61 A.B.A.J. 1246 (1975); *State v. Phinney*, 117 N.H. 145, 370 A.2d 1153 (1977)."

*Id.* at 934, 380 A.2d at 677. Despite the State's argument that frequent conflicts among psychiatric opinions bearing on a "predictive . . . finding" would render certainty beyond a reasonable doubt illusory or impossible, *id.* at 933, 380 A.2d at 677, the court decided that proof beyond a reasonable doubt of "'potentially serious likelihood' of dangerousness," *id.* at 934, 380 A.2d at 677, was readily conceivable, *id.*, and the court emphasized that difficulty of proof was not a justification for relaxed standards where liberty was at stake. Hence, the due process requirement of part I, article 15 of the State Constitution was held to mandate the highest burden, *id.* at 935, 380 A.2d at 677–78, a conclusion that was adopted on like reasoning when the State sought commitment for like reasons in criminal cases, following a verdict of not guilty by reason of insanity. *See State v. Gregoire*, 118 N.H. 140, 143, 384 A.2d 132, 133 (1978); *Gibbs v. Helgemoe*, 116 N.H. 825, 827–28, 367 A.2d 1041, 1043 (1976).

The subject did not lend itself to repose, however, and dissatisfaction with the reasonable doubt commitment standard focused on its application in criminal insanity cases. *Gregoire,* for example, describes a legislative attempt to overrule *Gibbs,* which was of uncertain constitutional status; and the decision of the Supreme Court of the United States a year later in *Addington v. Texas,* 441 U.S. 418 (1979), kept the subject in ferment.

*Addington* rejected a claim that the fourteenth amendment's due process clause mandated proof beyond a reasonable doubt before an individual could be committed on grounds of mental illness requiring hospitalization for the protection of himself or others. Having observed that an erroneously committed respondent had a better chance of obtaining release than an erroneously convicted criminal defendant, and that the dangerously ill respondent has a genuine need for hospitalization, the Court rejected the analogy between loss of liberty on criminal conviction and its loss by involuntary hospitalization. *Id.* at 428. Having thus denied that liberty was jeopardized identically in criminal trials and civil commitment proceedings, the Supreme Court had freedom to view the uncertainties of predictive psychiatric diagnosis in a different light from what this court had perceived in *Proctor.* Thus, the Supreme Court could seriously question

> "whether a state could ever prove beyond a reasonable doubt that an individual is both mentally ill and likely to be dangerous. *See O'Connor v. Donaldson,* 422 U.S. 563, 584 (1975) (concurring opinion); *Blocker v. United States,* 110 U.S. App. D.C. 41, 48–49, 288 F.2d 853, 860–861 (1961) (opinion concurring in result). *See also Tippett v. Maryland,* 436 F.2d, at 1165 (Sobeloff, J., concurring in part and dissenting in part); Note, Civil Commitment of the Mentally Ill: Theories and Procedures, 79 Harv. L. Rev. 1288, 1291 (1966); Note, Due Process and the Development of 'Criminal' Safeguards in Civil Commitment Adjudications, 42 Ford. L. Rev. 611, 624 (1974)."

*Id.* at 429–30. Accordingly, the Court concluded that a "state [should not] be required to employ a standard of proof that may completely undercut its efforts to further the legitimate interests of both the state and the patient that are served by civil commitments," *id.* at 430, and it held that clear and convincing proof of mental illness and the need for hospitalization would satisfy the demands of the fourteenth amendment. *Id.* at 433.

The effect of *Addington* did not stop with its federal due process holding, however. Although *Addington* was concerned with a commitment proceeding begun by civil petition, not with the disposition of a criminal defendant found not guilty by reason of insanity, the legislature responded to the federal case by seeking to change the State recommitment standard applicable in criminal insanity cases. This court declined to reexamine the State reasonable doubt requirement, however, and advised the Senate that the members of the court were "not persuaded that [the clear and convincing standard of *Addington*] adequately protects the liberty interests of our citizens." *Opinion of the Justices*, 122 N.H. 199, 204, 422 A.2d 594, 596 (1982).

But what the General Court could not accomplish by legislation, the Constitutional Convention of 1984 proposed, and in the same year the voters subsequently adopted, as an amendment to part I, article 15:

> "[I]n any proceeding to commit a person acquitted of a criminal charge by reason of insanity, due process shall require that clear and convincing evidence that the person is potentially dangerous to himself or to others and that the person suffers from a mental disorder must be established."

Thus was *Gregoire* superseded (and the phrase "due process" imported for the first time into the State Constitution).

The effect of this amendment on the standard for commitment on civil petition is the question before us. The terms of the amendment do not, of course, deal with commitments under RSA 135-C:34, and the respondent urges us to limit the amendment's effect to criminal insanity cases, which the application of its terms literally requires. On the respondent's view, for purposes of a commitment sought under § 34, this court is still free to affirm or reject the due process analysis adopted a decade ago in *Proctor* (a freedom that probably would not produce a unanimous opinion from the members of the court today).

We are unanimous, however, in believing that we have no such option to confine the effect of the 1984 amendment, for we perceive no intellectually realistic basis for holding that due process can require a burden of proof under RSA 135-C:34 that is different from the State's burden when it seeks commitment after a verdict of not guilty by reason of insanity to a criminal charge. From the moment this court first considered the burden of proof applicable in proceedings to commit for dangerous mental illness it has accepted the close resemblance, if not the virtual identity, of the

proceedings eventuating from civilly filed commitment petitions and insanity verdicts in criminal cases. *Gibbs* involved recommitments in insanity cases and imposed the reasonable doubt standard because of the loss of liberty and the uncertainty of psychiatric evidence. *Gibbs v. Helgemoe*, 116 N.H. at 828, 367 A.2d at 1043. *Proctor* involved commitment on civil petition and imposed the same burden for the same reasons. *Proctor v. Butler*, 117 N.H. 934–35, 380 A.2d at 677–78. In *Gregoire*, where the recommitment standard in an insanity case was in issue once again, the court cited *Proctor* and followed *Proctor*'s rationale. *State v. Gregoire*, 118 N.H. at 143, 384 A.2d at 133.

Nor is there any better reason today for distinguishing the cases with criminal origins from those with civil beginnings. In each, a commitment is conditioned on two findings: (a) that the respondent is "presently suffering from a mental disease or defect," RSA 651:8-b, IV (Supp. 1987), or has a "mental illness," RSA 135-C:34 (Supp. 1987); which mental disease or illness would (b) "create a substantial risk of bodily injury [to the respondent] or another, or serious damage to the property of another," RSA 651:8-b, IV (Supp. 1987), or "create a potentially serious likelihood of danger to [the respondent] or to others," RSA 135-C:34 (Supp. 1987). Except for the specific reference in the insanity statute to the risk of property damage, these provisions are parallel and substantially identical to each other. In each instance the court may deprive the respondent of his liberty by commitment against his will. In each case a commitment may be ordered only on a demonstration of mental illness that renders the respondent dangerous in the future. In each instance an initial commitment must be justified by proof of a specific act indicative of future risk (the criminal act charged in the insanity case, or an act charged in the petition under RSA 135-C:36, I(b) (Supp. 1987)); and in each instance the commitment order may be valid for a period as long as five years (RSA 651: 9-a, :11-a, I; RSA 135-C:46 (Supp. 1987)).

■ Although there are administrative, and perhaps some substantive, distinctions between the two types of cases, *compare*, *e.g.*, RSA 651:9-a (on finding dangerousness, court "shall commit . . . to secure psychiatric unit for five years") *with* RSA 135-C:45 (Supp. 1987) (court may order out-patient treatment), there is no distinction either in the potential for limiting liberty, or in the reliability of the evidentiary basis for doing so, that would justify a higher burden of proof in cases under RSA 135-C:34 than the burden now imposed by virtue of article 15 when the request for commitment follows a verdict of insanity in a criminal case. *Cf.*

*Jones v. United States*, 463 U.S. 354 (1983). There being no apparent justification for different standards, the 1984 amendment to article 15 requires us to overrule the portion of *Proctor v. Butler* dealing with burden of proof. Henceforth the petitioner's burden of proof in commitment proceedings under RSA 135-C:34 shall be that of clear and convincing evidence.

## IV.

The final issue for our consideration arises on the respondent's argument that any error in excluding the admissions should be treated as harmless, not calling for reversal. We have left this contention for the end, because the effect of the error should be assessed not only in relation to the record of other evidence but also in light of our holding that the burden of proof on the issues of mental illness and dangerousness will be by clear and convincing evidence if there is a retrial.

In a civil trial, when "'the case is a close one on the facts, and the [fact-finder] might have decided either way, any substantial error which might have tipped the scales in favor of the successful party calls for reversal.'" *Welch v. Gonic Realty Trust Co.*, 128 N.H. 532, 538, 517 A.2d 808, 811 (1986) (quoting *Bath v. Nelson*, 31 Ill. 2d 511, 514, 202 N.E.2d 494, 496 (1964)). *A fortiori*, when evidence erroneously excluded would have rendered a different result not only possible but probable, reversal and retrial are demanded.

As we observed above, exclusion of the respondent's admissions left the State with only circumstantial indications that the respondent had done the killing and tried to hide the body: there was evidence that he had quarrelled with his uncle at about the time of the death, and that the cause of death was consistent with the form that the respondent's aggressive behavior had taken in the past. The tepid indications of homicidal behavior by the respondent were supplemented by contested psychiatric evidence of illness, and by evidence indicating that the respondent was dangerous, but only under conditions of enforced confinement.

The addition of the respondent's admissions to this evidentiary record would have made a quantum difference to the proof of each element the State had to establish; and if there have been no significant changes of fact since the first trial, the effect of the admissions will be equally important on retrial. As against the court's prior finding that the respondent's mental condition was caused primarily by epilepsy or retardation, the respondent's own admissions give no indication that he killed during an epileptic seizure, and the unequivocal evidence that he did the killing will

underscore the fact that homicidal behavior is not necessarily characteristic of the retarded. Thus, the admissions will have a strong tendency to demonstrate that the respondent's mental impairment amounts to something more than retardation or epilepsy. The admissions also will indicate a degree of dangerousness, even when the respondent is free of enforced confinement, that needs no extended analysis here.

 If the probate court had considered the admissions and applied a clear and convincing standard of proof, a different result at the first trial would have been not merely possible, but highly probable. Although the possibility that further relevant evidence has developed in the intervening time precludes any pre-judgment about the result of retrial, the combined significance of the admissions erroneously excluded and the burden of proof now redefined requires that an opportunity for retrial be granted forthwith.

*Reversed and remanded.*

BATCHELDER, J., concurred in part and dissented in part; the others concurred.

BATCHELDER, J., concurring in part and dissenting in part: I concur in part III of the majority opinion, as well as in part II insofar as the decision is based on federal constitutional law. I disagree, however, with the majority's conclusion in part II of the opinion that a State constitutional claim was not sufficiently litigated to prompt an independent analysis by this court on the issue of voluntariness of the respondent's statements. I would conclude that the prerequisites set forth in *State v. Dellorfano*, 128 N.H. 628, 632, 517 A.2d 1163, 1166 (1986) have been met in this case and that the respondent is therefore entitled to an independent analysis of his claim under our constitution. In my view, the majority opinion is unduly restrictive in its application of *Dellorfano* and its progeny.