Grafton County Probate Court
No. 84-388

*In re* ARTHUR M. BROWN

March 28, 1985

*Stephen E. Merrill*, attorney general (*Douglas L. Patch*, assistant attorney general, on the brief and orally), for the State.

*David J. Trumble*, New Hampshire Mental Health Law Clinic, by brief and orally, for the respondent.

KING, C.J. This is an appeal of an order of the Grafton County Probate Court (*Boyle*, J.), involuntarily committing Arthur M. Brown to the New Hampshire Hospital, pursuant to RSA chapter 135-B (1977 and Supp. 1983), for a period not to exceed two years, due to mental illness which created a potentially serious likelihood

of danger to himself and others. *See* RSA 135-B:26. Mr. Brown argues on appeal that the committal procedures violated his due process rights and that the probate court's findings were erroneous. We disagree and affirm.

Mr. Brown was seventy-eight years old when he was arrested in Bristol on April 12, 1984, for disobeying a police officer and resisting arrest after being stopped for driving a motor vehicle with a faulty taillight. He was subsequently taken to the New Hampshire Hospital for a psychiatric evaluation. The Grafton County Attorney, John Eames, then filed a petition against Mr. Brown for involuntary admission to the hospital.

On July 17, 1984, a hearing was held in the probate court regarding the civil commitment petition against Mr. Brown. A Bristol police officer testified at the hearing that, after he had stopped Mr. Brown's automobile for having a faulty taillight, Mr. Brown refused to produce his driver's license and registration on request, saying that he would have the light fixed. Mr. Brown then attempted to drive away. The officer testified that he reached into the car and turned off the engine, at which point Mr. Brown became belligerent and started his engine a second time. The officer, who was still standing next to the car while Mr. Brown sat inside, again reached in to turn off the engine. Mr. Brown grabbed a plastic flashlight from the dashboard and swung it at the officer, who stepped back to avoid the blow.

At this point, the officer radioed for a second officer to assist him. When the second officer arrived, he distracted Mr. Brown while the first officer was able to wrest the flashlight away from Mr. Brown, who was placed under arrest for disobeying a police officer. Both officers testified that, later, while he was handcuffed and in the back seat of the police cruiser, Mr. Brown made a statement to the effect that, if he had a pistol permit and could carry a gun, he would have shot the officers.

Dr. Carl Bridge, a psychiatrist appointed by the court to examine Mr. Brown as required by RSA 135-B:32, testified at the hearing that he concluded, from his evaluation, that Mr. Brown has atypical bipolar disorder (the more current term for manic depressive illness) and is therefore mentally ill as that term is defined by the civil commitment statute. *See* RSA 135-B:2, XI (Supp. 1983). Dr. Bridge testified that he based his diagnosis on a visit with Mr. Brown lasting between thirty-five and forty minutes and a review of Mr. Brown's medical record. In a psychiatric evaluation report to the court, Dr. Bridge noted that Mr. Brown was not well groomed and that, although he answered questions "relevantly and somewhat coherently," he had "a tendency to ramble." When asked what day it

was, Mr. Brown answered that it was July 14, 1948, instead of the actual date of the interview, July 12, 1984. Dr. Bridge testified that this answer indicated "disorientation as to time." According to Dr. Bridge, Mr. Brown had hallucinations in which he communicated with and was visited by his dead parents, and that he also claimed to own property that he does not own.

Dr. Bridge also testified that, in his opinion, Mr. Brown's mental condition created a potentially serious likelihood of danger to himself and others. Dr. Bridge recommended that Mr. Brown receive two years of involuntary treatment. Although he considered a less restrictive alternative placement, Dr. Bridge testified that, in his opinion, Mr. Brown would be unable to "cooperate" with a less restrictive placement.

After the hearing, on July 17, 1984, the Court (*Boyle*, J.) ordered Mr. Brown to be involuntarily admitted to the New Hampshire Hospital for a period not to exceed two years. This appeal followed.

Mr. Brown first argues that psychiatric reports are inherently inadequate because psychiatric diagnosis and psychiatric predictions of dangerousness are unreliable. As a consequence, he contends that the court's reliance on a psychiatric report denied him his right to due process under the fourteenth amendment of the United States Constitution.

In determining whether the procedural safeguards of RSA chapter 135-B protected Mr. Brown's due process rights, we apply the balancing test set out in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), and followed by this court in the context of involuntary commitment in *In re Scott L.*, 124 N.H. 327, 331, 469 A.2d 1336, 1337 (1983). We consider three factors:

> "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

*Mathews v. Eldridge*, 424 U.S. at 335. *See also Ake v. Oklahoma*, 105 S. Ct. 1087 (1985).

As we have recently stated in *In re Scott L.*, *supra* at 330, 469 A.2d at 1337, "the deprivation of liberty inherent in civil commitment is subject to significant due process requirements." *See Opinion of the Justices*, 123 N.H. 554, 465 A.2d 484 (1983). However, the

risk of erroneous deprivation of liberty by a court's reliance on a psychiatric report, we believe, is sufficiently minimized in civil commitment proceedings. We have recognized the fallibility of psychiatric opinions on the issue of whether a person meets the criteria for involuntary admission, *In re Scott L., supra* at 332, 469 A.2d at 1338, and the speculative nature of psychiatric predictions of dangerousness, *Proctor v. Butler,* 117 N.H. 927, 934, 380 A.2d 673, 677 (1977). Nevertheless, a number of safeguards protect against an erroneous deprivation of liberty in a civil commitment. *See In re Scott L., supra* at 332, 469 A.2d at 1338 (enumerating safeguards against "excessive deference" to psychiatric opinions in involuntary admissions).

■ This State requires proof beyond a reasonable doubt in determining mental illness and potential dangerousness under RSA 135-B:26. *Proctor v. Butler,* 117 N.H. 927, 934, 380 A.2d 673, 677 (1977). Also, RSA 135-B:28 requires evidence of "specific acts or actions of the person sought to be admitted" before a petition for involuntary admission may be brought. The court need not rely upon the psychiatrist's recommendation and may in fact ignore or overrule the recommendation. RSA 135-B:37. "Without such evidence of specific recent conduct, and unless the high standard of proof is satisfied, even the most persuasive psychiatrist's report is insufficient to justify commitment—ultimately a judicial, not medical, decision." *In re Scott L., supra* at 332, 469 A.2d at 1338.

The fact that, in the case at hand, the psychiatric examination was short in duration does not of itself make the resulting evaluation deficient. *See State v. Hudson,* 121 N.H. 6, 10, 425 A.2d 255, 257 (1981) (psychiatric examination, as the basis for a physician's certificate recommending civil commitment, that lasted only a few minutes was sufficient under RSA chapter 135-B). Here, Dr. Bridge conducted a longer interview than was done in the *Hudson* case and, more significantly, reviewed Mr. Brown's medical report.

■ Finally, we find that the current procedure promotes the governmental interest (and the concomitant public interest) in an accurate psychiatric evaluation that does not unduly burden the State fiscally or administratively. After weighing the factors suggested by *Mathews v. Eldridge,* 424 U.S. at 335, and noting in particular the safeguards in RSA chapter 135-B against excessive deference to psychiatric opinions, *see In re Scott L., supra* at 332, 469 A.2d at 1338, we hold that the use of a psychiatrist to examine Mr. Brown and report to the probate court did not deny Mr. Brown's right to due process.

Mr. Brown's second argument is that he has a constitutional right to placement in the least restrictive alternative, under the due process clause of the fourteenth amendment, and that this right was denied him by the commitment procedure used. He therefore contends that RSA chapter 135-B is unconstitutional in that it fails to require that such least restrictive placement be mandatory.

The involuntary commitment statute requires that psychiatric examinations include "what possible alternatives, including the least restrictive alternative, were considered by the examining psychiatrist." RSA 135-B:32, V. If a court decides to order involuntary admission of a person despite a contrary recommendation by the examining psychiatrist, "the court may overrule the recommendation of the psychiatrist as to the form of treatment only after the court finds that treatment other than involuntary admission would not be in the best interests of the patient and the community." RSA 135-B:37. Underlying this commitment procedure is the statute's purpose of guaranteeing humane, individualized treatment to mentally ill persons. *See* RSA 135-B:1.

■ This statutory approach permits, but does not require, placement in a least restrictive alternative. *See* RSA 135-B:32, V. The statute ultimately provides that the judge shall make the final decision as to whether to commit a person based on "the best interests of the person and the community." *See* RSA 135-B:37. We cannot say that this procedure violates Mr. Brown's due process rights; nor can we say that a procedure *mandating* placement in a least restrictive alternative would reduce the risk of erroneous deprivation of a person's interest in a manner that would not be too costly or burdensome to administer. *See Mathews v. Eldridge*, 424 U.S. at 335 (due process balancing test); T. Gutheil, P. Appelbaum and D. Wexler, *The Inappropriateness of "Least Restrictive Alternative" Analysis for Involuntary Procedures with the Institutionalized Mentally Ill*, II J. PSYCHIATRY & LAW 7, 12 (1983) (study of commitment decisions found that judges were confused by the doctrine of "least restrictive alternative" and applied it erratically).

■ As this court has held in the past, a person's liberty may be curtailed only to the extent necessary to protect the person and the public, *Dolcino v. Clifford*, 114 N.H. 420, 421, 321 A.2d 577, 578 (1974). Moreover, the absence of less restrictive alternatives need not be proved beyond a reasonable doubt. *Proctor v. Butler*, 117 N.H. at 935, 380 A.2d at 678. In light of our interpretations of the statute, we hold that RSA chapter 135-B on its face, and as applied, is constitutional and does not deprive Mr. Brown of due process of law in its commitment procedure.

Mr. Brown next argues that the probate court's findings of fact were clearly erroneous. The statute requires a showing of mental illness and "a potentially serious likelihood of danger to [Mr. Brown] or to others," RSA 135-B:26, by specific acts or actions, RSA 135-B:28, as proven beyond a reasonable doubt. *Proctor v. Butler*, 117 N.H. at 935, 380 A.2d at 676. Regarding proof of potential dangerousness, this court has stated:

> "[I]t is not dangerousness in any absolute sense of which the trier of fact must be convinced, but rather 'a potentially serious likelihood' of dangerousness. It is not difficult to conceive of circumstances in which evidence of past conduct and mental disability will convince 'beyond a reasonable doubt' of a potentially serious likelihood of dangerousness."

*Id.* at 933–34, 380 A.2d at 677.

In reviewing a trial court's findings of mental disease and potential dangerousness, we will uphold the trial court's findings unless we determine that no rational fact-finder could make the findings beyond a reasonable doubt. *State v. Robb*, 125 N.H. 581, 585, 484 A.2d 1130, 1132 (1984); *State v. Paradis*, 123 N.H. 68, 71, 455 A.2d 1070, 1072 (1983).

In the instant case, the probate court based its decision on evidence that Mr. Brown hallucinated, refused to comply with lawful requests from police officers, refused to accept the fact that he did not own real estate once owned by his father, threatened and assaulted police officers, and resisted arrest. Additionally, Mr. Brown swung at the officers with a flashlight and said he would have shot the officers if he had had a pistol. Also, Dr. Bridge gave his opinion that Mr. Brown suffers from atypical bipolar disorder, or manic depressive illness.

From the evidence in the record, a rational finder of fact could determine beyond a reasonable doubt that Mr. Brown was mentally ill and potentially dangerous. *See State v. Robb supra*. We therefore conclude that the probate court's findings of fact were proper.

*Affirmed.*

All concurred.