Belknap County Probate Court
No. 88-394

*In re* DEMITRI J. FASI, A/K/A STEPHEN R. CASS

December 13, 1989

*John P. Arnold*, attorney general (*David S. Peck*, assistant attorney general, on the brief and orally), for the petitioner.

*Twomey & Sisti Law Offices*, of Dover (*Mark L. Sisti* and *Nicholas K. Holmes* on the brief, and *Mark Sisti* orally), for the respondent.

PER CURIAM. The Belknap County Probate Court (*Cushing*, J.) found the petitionee "to be suffering from mental illness . . . so as to create a potentially serious likelihood of danger to himself and

others," and committed the respondent to the secure psychiatric unit (SPU) of the New Hampshire State Prison.

In this appeal, the petitionee challenges his involuntary commitment to the SPU on four grounds: (1) that the probate court erred in finding that the petitionee was not justified under RSA 627:1 in using deadly force against Howard Denney; (2) that the probate court erred in admitting as evidence events too remote in time to form the basis for an involuntary commitment; (3) that there was insufficient evidence to support the probate court's finding that the petitionee presented a danger to himself or others warranting commitment under RSA 135-C:34 (Supp. 1988); and (4) that there was insufficient evidence to justify commitment to the SPU. We find no merit in these claims and affirm the decree of commitment.

The petitionee, Demitri Fasi, and Howard Denney both resided on Rowe Court in Laconia, occupying adjoining apartments separated by a common wall. On the evening of December 23, 1987, Howard Denney was at home in his apartment entertaining friends who had dropped by for a Christmas visit. Over the course of the evening, Denney consumed several alcoholic beverages.

Beginning sometime between 7:00 and 7:30 p.m., Demitri Fasi began pounding on the common wall, causing an aggravating thumping sound in Denney's apartment that was clearly audible throughout the evening, although during occasional intervals the pounding discontinued or became less pronounced. Numerous chopmarks, holes, and slices later discovered on the walls and floors of Fasi's apartment, together with a small hatchet found on top of his VCR, were consistent with the loud thumping noise heard that night by the occupants of Denney's apartment.

Denney first attempted to abate the disturbance by knocking on his side of the wall and calling out to Fasi, requesting that he quiet down. When the pounding persisted despite these requests, Denney grew angry, voicing his intent to make the noise stop if it continued. Fasi responded with words to the effect that "if you want to come and shut me up, come and shut me up." This type of exchange occurred at least three times.

At 10:00 Denney asked his friends to leave because he had to work the next day and wanted to go to sleep. The pounding however did not relent, and at approximately 11:00, Denney left his own apartment for the stated purpose of "shutting the neighbor up." For the next twenty minutes Denney stood outside of Fasi's apartment insisting in a loud voice that Fasi "come out and talk about it." Denney stated that he wasn't going to break the door down, but the pounding had to stop. In the end, however, it came to that:

Denney climbed to the top step of Fasi's apartment and yanked open the screen door, tearing it off the frame.

Three seconds later, the primary wooden door to Fasi's apartment opened, and Fasi shot Denney in the face with a sawed-off shotgun, killing Denney as he stood outside the door. Fasi then grabbed Denney's legs and attempted to drag the fallen body out of the doorway. Failing at this he ran through the snow and threw the sawed-off shotgun in a nearby river. He attempted to flush ammunition down his toilet and he returned to Denney's body and kicked it repeatedly.

Fasi was arrested and arraigned on a charge of second degree murder, but was found incompetent to stand trial. The State then sought his involuntary commitment, filing a petition on June 10, 1988, in the Belknap County Probate Court pursuant to RSA 135-C: 36 (Supp. 1988). At the hearing on the petition, the State addressed the issue of Fasi's dangerousness, and corresponding need for commitment, by offering the testimony of several witnesses.

Ralph C. Higgins, who had known Fasi for over thirteen years, testified that on November 2, 1987, he met the petitionee while walking down the street in Laconia. Higgins stated that he had a court appearance the next day, and that, for this reason, Fasi agreed to allow him to stay at his apartment overnight. The two men went out for pizza, returning to Fasi's apartment with a 12-pack of beer which they drank without incident until approximately 10:00 when they went to sleep. According to Higgins, however, Fasi startled him sometime between 2:00 and 3:00 a.m. by kicking him and demanding that he get out of the apartment. Higgins testified that he noticed, as he awakened, that Fasi had a gun pointed at his head and a knife at his neck. He heard the gun cock back and Fasi nicked him with the knife. Higgins testified to his fear of Fasi at the time, stating that he headed right out the door without getting dressed.

Dr. Carl J. Bridge, a psychiatrist who examined Fasi at the request of the court, testified that Fasi is prone to violent behavior because of his paranoid ideas that are easily provoked. Specifically, Dr. Bridge explained, Fasi attributes to himself many famous musical and literary works, and he believes that these creative things are being stolen from him. According to Dr. Bridge, Fasi imagines that there is a widespread conspiracy against him, and he easily incorporates the people he comes in contact with into his delusional pattern. It was Dr. Bridge's opinion that Fasi suffers from a mental illness presenting a serious likelihood of danger to himself and others, and that involuntary commitment to the secure

psychiatric unit is necessary and appropriate for treatment of the illness.

The State also offered the testimony of Dr. Albert Drukteinis, a psychiatrist initially appointed by the superior court to evaluate Fasi's competency to stand trial. Dr. Drukteinis examined Fasi on two other occasions prior to the hearing on the petition and, like Dr. Bridge, indicated that Fasi suffers from a delusional paranoid disorder. He elaborated upon the persecutory nature of Fasi's thinking, describing Fasi's bizarre and unwavering belief that the victim Denney, along with others, had broken into his apartment on numerous nights and knocked him unconscious for the purposes of sexually assaulting him and stealing his intellectual property. According to Dr. Drukteinis, Fasi believes that Denney bought himself a new television set and a tractor trailer with the proceeds from the sale of the stolen copyrighted materials. Fasi, moreover, admitted to Dr. Drukteinis that he procured a twelve gauge sawed-off shotgun in order to defend against these perceived nocturnal break-ins.

Dr. Drukteinis offered further testimony outlining a nine-year history of Fasi's assaultive conduct, including a prior arrest and conviction, wherein Fasi provoked an incident of violence he later claimed was self-defense. When asked if it was possible that Fasi had a reasonable fear of Denney on December 23, 1987, Dr. Drukteinis responded that "it is more likely that [Fasi's] fear was precipitated by his delusions and his standing or lying in wait for perpetrators to come." Dr. Drukteinis pointed out that even at the time of the hearing, Fasi was continuously making complaints of abuse by correctional officers at the SPU, accusing the staff of entering his cell during the night and raping him. Like Dr. Bridge, Dr. Drukteinis testified that Fasi's elaborate delusional system is quick to include new people he comes in contact with, and that involuntary commitment is necessary for treatment of his mental illness.

Following three days of testimony, the probate court found that the killing of Howard Denney by Demitri J. Fasi was not justifiable. The court noted that Fasi deliberately created and manipulated a confrontational situation by, first, pounding on the common wall of the adjoining apartments, and then, later, encouraging Denney to try to stop him. The court further found that Fasi had approximately twenty minutes to make peace with Denney after he came to the door but that Fasi elected instead to lie in wait with a loaded sawed-off shotgun. Based on all of the evidence, the court found that Fasi was mentally ill within the

meaning of RSA 135-C:34 (Supp. 1988), and ordered him involuntarily committed to the secure psychiatric unit for a period not to exceed five years. This appeal followed.

At the outset, the petitionee disputes the sufficiency of the evidence supporting the probate court's finding that the killing of Howard Denney was unjustified. Arguing that he was justified within the meaning of RSA chapter 627 in using deadly force, the petitionee contends that his conduct on the night of December 23, 1987, was improperly made the basis of the petition for involuntary commitment, because RSA 627:1 provides a complete defense to any civil action based on justified conduct. Before considering the petitionee's argument as to the sufficiency of the evidence, however, we must confront the more basic question of whether the defense of justification is applicable to involuntary commitment proceedings.

RSA 627:1 provides that "conduct which is justifiable under this chapter constitutes a defense to any offense. The fact that such conduct is justifiable shall constitute a complete defense to any civil action based on such conduct." RSA 627:1. Thus, the defense of justification is an exculpatory defense which, if proved, not only results in a finding of no criminal liability, but also relieves a defendant of any civil liability which might attach to the particular conduct in question. Moreover, RSA 627:1 does not on its face distinguish between civil actions for damages and other kinds of civil actions; rather, its literal terms, strictly construed, apply to "any civil action" based on justified conduct. Initially, then, we must determine whether a civil commitment proceeding is based upon specific conduct alleged in a petition, so as to warrant application of the defense of justification.

RSA 135-C:36 (Supp. 1988) requires that a petition for civil commitment allege specific acts or action demonstrating dangerousness. However, while a civil commitment proceeding "is initiated on the basis of an act" alleged in the petition, the proceeding itself focuses on the present mental condition of the petitionee, and the propensity of the petitionee to commit future dangerous acts. *State v. Mercier*, 128 N.H. 57, 64, 509 A.2d 1246, 1251 (1986). For this reason, despite the commission of an act alleged in the petition, no one may be civilly committed "unless commitment is shown to be necessary to protect the person or public from dangerousness caused by mental illness." *Id.* at 65, 509 A.2d at 1252.

■ Like the "specific acts requirement," a psychiatrist's report is also, "by statute, a crucial piece of evidence at the commitment hearing." *In re Scott L.*, 124 N.H. 327, 330, 469 A.2d 1336, 1337 (1983). RSA 135-C:36 (Supp. 1988) requires that a petition for involuntary commitment "be accompanied by a certificate of a physician who has examined the person sought to be committed within five days of the filing of the petition, stating that, based upon his examination, he believes the person sought to be committed is in such a medical condition as to be dangerous to himself or others." *State v. Hudson*, 121 N.H. 6, 9–10, 425 A.2d 255, 256 (1986). Our cases emphasize, however, that the "condition of dangerousness is not a medical concept, but rather a legal one," and that a court may "overrule the recommendation of a psychiatrist against involuntary commitment." *State v. Hudson*, 119 N.H. 963, 967, 409 A.2d 1349, 1351 (1979).

■ In assessing present dangerousness, a court may, in its discretion, attach substantial weight to the evidence of past acts manifesting dangerousness, and ignore a psychiatrist's contrary recommendation. *See In re Brown*, 126 N.H. 309, 313, 493 A.2d 447, 450 (1985). Similarly, a psychiatrist's finding of a dangerous mental condition does not automatically operate to trigger commitment; without evidence of dangerous conduct, "even the most persuasive psychiatrist's report is insufficient to justify commitment." *In re Scott L.*, 124 N.H. 327, 332, 469 A.2d 1336, 1338 (1983). In summary, there is no mechanical test for involuntary commitment, but commitment will not be ordered without proof of specific acts or actions demonstrating dangerousness. *See In re Field*, 120 N.H. 206, 209, 412 A.2d 1032, 1033–34 (1980).

■ Proof of the commission of such past acts is not, however, tantamount to proof of present dangerousness, and is not, accordingly, the touchstone for commitment. Such acts are merely prognostic evidence of future dangerousness to be considered by a judge in determining a petitionee's present state of mental health. Present mental condition is the specific issue in an involuntary commitment proceeding, and it is the judge who, on the basis of all the evidence produced at trial, "must determine whether a patient's illness has met the statutory standard." *In re Ronnie Prime*, 120 N.H. 849, 850, 424 A.2d 804, 805 (1980). Just as we recognize "the fallibility of psychiatric opinions on the issue of whether a person meets the criteria for involuntary commitment," *In re Scott L.*, 124 N.H. 327, 332, 469 A.2d 1336, 1338 (1983), we recognize the fallibility of particular acts offered as proof of

dangerous mental condition. Accordingly, civil commitment is not, in any absolute sense, founded upon the specific acts alleged in a petition. Rather, civil commitment is based upon a mental condition of dangerousness, as determined by the trial judge. Ultimately, confinement is ordered "not for what one has done, but for what one will do." *Proctor v. Butler*, 117 N.H. 927, 934, 380 A.2d 673, 677 (1977).

We conclude that despite the specific acts requirement of RSA 135-C:34 (Supp. 1988), a civil commitment proceeding is not a "civil action based upon such conduct" within the meaning of RSA 627:1, and the defense of justification does not apply in this case. Any specific acts alleged in the petition are therefore appropriately considered as prognostic evidence of dangerousness, whether or not the acts are justified under the criteria of RSA chapter 627. While a court's assessment of such evidence is appropriate in the determination of a petitionee's mental condition, and the likelihood of future dangerousness, we note that a petitionee may, in turn, offer rebuttal evidence tending to dispute dangerousness. The petitionee may, accordingly, show that the acts alleged in a petition are justified under the criteria of RSA chapter 627. However, because a civil commitment proceeding does not fall within the ambit of the justification defense, a petitionee may not invoke RSA 627:1 to exclude the particular conduct from a court's consideration. Therefore, we need not consider whether the probate court erred in finding that the petitionee's action was not justified.

We now turn to the respondent's claim of error regarding a separate incident of violence. Before involuntary confinement can be ordered, RSA 135-C:36, I(b) requires the petitioner to allege specific acts or actions demonstrating dangerousness. The petitionee disputes the probative value of an act which occurred on November 3, 1987, seven months prior to the filing of the petition, wherein he threatened Ralph Higgins with a knife and a shotgun. Specifically, the petitionee argues that this event was too remote in time from June 10, 1988, when the petition was filed, and that the probate court erred in considering this evidence when ruling on the merits of the petition. We disagree.

It is settled that for purposes of a civil commitment proceeding, "what is 'sufficiently recent' will depend on the nature and circumstances of the act, the history of the person in question and the probative force of the other evidence adduced to prove dangerous propensity." *State v. Mercier, supra* at 64, 509 A.2d at 1251. Accordingly, we find that the significance of the November

3rd incident lies not in its recency, but in its similarity to other episodes of violence involving the petitionee's use of lethal weapons. The actions of the respondent on November 3, 1987, were sufficiently recent to show a pattern of conduct manifesting dangerousness. *In re Ronnie Prime*, 120 N.H. 849, 851, 424 A.2d 804, 806 (1980).

The petitionee's third argument is that the State failed to prove beyond a reasonable doubt that he suffers from a mental condition as defined by RSA chapter 135-C, so as to create a potentially serious likelihood of danger to himself or to others. Because the court below found that the State had proved the need for involuntary commitment beyond a reasonable doubt, we must begin our analysis of this issue by addressing the standard which the court was required to apply in determining whether the petitionee was a "person in such mental condition as a result of mental illness as to create a potentially serious likelihood of danger to himself or to others." RSA 135-C:34.

In the recent case of *In re Sanborn*, we considered the burden of proof applicable to proceedings to commit for dangerous mental illness, and determined that "henceforth the petitioner's burden of proof in commitment proceedings under RSA 135-C:34 shall be that of clear and convincing evidence." *In re Sanborn*, 130 N.H. 430, 446, 545 A.2d 726, 736 (1988). Accordingly, we must review the court's commitment order by determining whether it "drew the requisite statutory conclusions with a clear and convincing degree of assurance." *Id.* at 441. We note that the standard we apply today requires a lesser degree of factual certainty than the reasonable doubt standard and that, for this reason, the effect of the probate court's error is harmless unless we find that no rational fact-finder could have found proof by clear and convincing evidence. *See In re Brown*, 126 N.H. 309, 315, 493 A.2d 447, 451–52 (1985).

The petitionee argues that the State improperly based its petition on two separate "specific acts": the killing of Howard Denney on December 23, 1987, and the incident involving Ralph Higgins on November 3, 1987. For the reasons already stated, which need not be repeated, we find that both events were properly before the court, and on the basis of all the evidence in the case, we are satisfied that a rational fact-finder could have found dangerousness by clear and convincing evidence.

Finally, we address whether the evidence in the case was sufficient to support the probate court's finding that the petitionee would present a danger to himself or others if committed to a less secure facility than the SPU. We note that once the standard for involuntary commitment is met, "the probate court need determine only by a preponderance of the evidence . . . that the individual would be a danger to himself or others 'if admitted or retained in a receiving facility in the State mental health services system.'" *In re Champagne*, 128 N.H. 791, 793, 519 A.2d 310, 311 (1986). We are mindful that the evidence necessary to show a need for commitment to the SPU "may be 'evidence that gave rise to the [original] criminal charges . . . [and] may be based on a pattern of prior action and testimony relating to the question whether or not any cure for the defendant's condition has been effected.'" *In re Champagne*, 128 N.H. at 793, 519 A.2d at 311 (quoting *State v. Hudson*, 119 N.H. 963, 967, 409 A.2d 1349, 1351–52 (1979)). Both psychiatrists testified that in spite of his therapy, the petitionee continues to incorporate new persons into his delusional system, and that the same incorporation would likely take place if he were committed to the New Hampshire Hospital rather than the SPU. Dr. Drukteinis specifically testified that the respondent's belief in a persecutory conspiracy causes him to look for perpetrators in any new setting, and that once there are new perpetrators, there is a corresponding need to retaliate. Viewing the evidence in its totality, we conclude that a rational fact-finder could find by a preponderance of the evidence that the petitionee presented a potential danger to himself or to others, warranting commitment to the SPU.

Because of the result reached, we need not address the issue raised in the State's cross-appeal. We therefore affirm the decision of the probate court.

*Affirmed.*

BATCHELDER, J., did not sit.