NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by email at the following address: reporter@courts.state.nh.us.  Opinions are available on the Internet by 9:00 a.m. on the morning of their release.  The direct address of the court's home page is: https://www.courts.nh.gov/our-courts/supreme-court

THE SUPREME COURT OF NEW HAMPSHIRE

_____

6th Circuit Court-Concord Probate Division
No. 2021-0215

IN RE K.C.

Argued: February 23, 2022
Opinion Issued: April 21, 2022

John M. Formella, attorney general, and Anthony Galdieri, solicitor general (Laura E. B. Lombardi, senior assistant attorney general, on the memorandum of law and orally), for the petitioner.

Amy B. Davidson, of Contoocook, by brief and orally, for the respondent.

HANTZ MARCONI, J.  The respondent, K.C., appeals a decision of the Circuit Court (Maloney, J.) ordering her involuntary admission to New Hampshire Hospital (NHH) for a period of two years with a conditional discharge when and if clinically appropriate.  On appeal, the respondent contends that the petitioner, NHH, presented insufficient evidence at the hearing to support the trial court's order.  We agree and reverse.

I. Background

The following facts either were found by the trial court or are otherwise supported by the record.  The respondent has been diagnosed with "Bipolar I disorder, manic with Psychotic features."  On March 9, 2021, she took herself

to a hospital emergency room because she felt unsafe. Her speech was pressured "with a flight of ideas." The respondent reported to a medical provider that she had once driven 75 miles per hour in a 55-mile-per-hour zone, while she was on her phone, believing that somebody "was hacking her phone and rerouting her to people in black ops." The respondent further reported that she had "gone to the [local police] multiple times" and that the police had not helped her. It was later confirmed that she had contacted the local police 300-400 times over the past year, that there were two protective orders preventing her from contacting her ex-husband and another man, and that there were criminal complaints pending against her for violating those orders. According to the respondent, the protective orders were issued because her ex-husband and the other man "stated that she has . . . followed them to their home[s]."

The respondent was admitted to NHH on March 25. She had been previously admitted to NHH in February 2020. The respondent has refused all medication and has refused to sign releases to allow NHH to obtain information from other treatment facilities.

The respondent was examined by a treating psychiatrist at NHH and a court-appointed psychiatrist. The respondent's treating psychiatrist testified that she interacts with the respondent "[e]very day Monday through Friday" and has found the respondent to have "[v]ery paranoid" delusions. She described the respondent's thoughts as "very disorganized" and "not reality-based." The treating psychiatrist described the respondent as "very irritable, agitated," and unpredictable.

The treating psychiatrist opined that the respondent is in such a condition, as a result of her mental illness, as to create a potentially serious likelihood of danger to herself or others because of her paranoid delusions. The treating psychiatrist explained: "Because of her delusions, she would not be safe in the community and she will make accusations against others. . . . [I]f she was to go out in the community, she can meet someone who's not as savvy, . . . who may hurt her, put her life at risk because they are not aware that she has a mental health illness." The treating psychiatrist also testified that, during her 2020 admission to NHH, the respondent believed that a hospital social worker was "out to get her," and, after her discharge, the respondent returned to NHH to confront the social worker. (Quotation omitted.)

The court-appointed psychiatrist likewise opined that the respondent is in such mental condition, as a result of mental illness, as to create a potentially serious likelihood of danger to herself and others because of her "active paranoid delusions, impaired judgment and lack of insight." The court-appointed psychiatrist opined that, as a result of the respondent's delusional "[f]ears of covert danger . . . , impaired judgment and lack of insight," she has

2

"placed herself and others at risk in her efforts to protect herself," such as by "driving while psychotic," and has "possibly [placed] herself at risk by avoiding indicated medical care."

Following an April 22, 2021 hearing, the trial court found that NHH had met its burden of proof by clear and convincing evidence and ordered the respondent to be admitted to NHH for two years with a conditional discharge when and if clinically appropriate. The respondent unsuccessfully moved for reconsideration, and this appeal followed.

II. Analysis

Our standard of review is set forth by statute: The trial court's factual findings are "final unless they are so plainly erroneous that [they] could not be reasonably made." RSA 567-A:4 (2019); see In the Matter of B.T., 153 N.H. 255, 259 (2006). Thus, we do not reweigh the evidence to determine whether we would have ruled differently. In re R.M., 172 N.H. 694, 698 (2019). Instead, we review the record to determine if the trial court's findings could be reasonably made given the evidence before it. Id. We will uphold the court's decision to admit the respondent on an involuntary basis unless no rational fact finder could have made the findings supporting that decision by clear and convincing evidence. Id.; see B.T., 153 N.H. at 260.

"The standard to be used by a court . . . in determining whether a person should be admitted . . . for treatment on an involuntary basis shall be whether the person is in such mental condition as a result of mental illness as to create a potentially serious likelihood of danger to [herself] or to others." RSA 135-C:34 (2021). The phrase "danger to [herself] or to others" means either "a threat of, a likelihood of, an attempt to inflict, or an actual infliction of serious bodily injury to oneself or another or a lack of capacity to care for one's own welfare such that there is a likelihood of serious debilitation if admission is not ordered." B.T., 153 N.H. at 260-61 (quotation omitted). The petitioner must prove dangerousness by clear and convincing evidence. See id.

As we observed in B.T., the legislature has declared that "'[i]t is the policy of this state that mental illness in and of itself is insufficient to involuntarily admit any person into the mental health system.'" Id. at 261 (quoting RSA 135-C:1, III). Consistent with this policy, involuntary admission may not be ordered "based solely on the existence of a mental illness." Id. Rather, involuntary admission requires "clear and convincing proof of specific acts demonstrating actual or likely serious bodily injury." Id.

Further, the petitioner in an involuntary admission proceeding "must prove 'current dangerousness' in the sense of a recent dangerous act." R.M., 172 N.H. at 698. Although, in assessing "present dangerousness, a court may,

3

in its discretion, attach substantial weight to the evidence of past acts manifesting dangerousness," proof of past acts is not "tantamount to proof of present dangerousness, and is not, accordingly, the touchstone for commitment." In re Fasi, a/k/a Cass, 132 N.H. 478, 484 (1989). Rather, past acts "merely help to predict the possibility of future dangerousness" if they are "sufficiently recent or sufficiently similar" to the acts giving rise to the petition. B.T., 153 N.H at 262.

On appeal, the respondent argues that "none of [her] alleged acts or statements, whether taken together or in isolation, rose to the level of dangerousness sufficient to satisfy the statutory requirements." We agree.

The evidence in this case is similar to the evidence we held insufficient in B.T. See id. at 261-63. In B.T., the evidence of dangerousness included evidence that B.T. "had poor insight into her illness and a history of choosing to discontinue her medications." Id. at 261. Without medication, B.T. experienced "severe agitation, emotional lability, delusional thinking, and paranoid ideation." Id. (quotation omitted). There was also evidence that B.T. was found wandering on a street in a confused state, complaining of chest pains, id. at 256, and that, approximately five years before the involuntary commitment hearing, she had overdosed on pain medication, id. at 262. The trial court heard additional evidence in the form of an expert opinion and report of the court-appointed psychiatrist that B.T. posed a potentially serious likelihood of danger to herself or others due to her mental illness. Id.

We held that evidence of B.T.'s agitation, emotional lability, delusion, and paranoia and that she walked on the street in a confused state and complaining of chest pains was insufficient, as a matter of law, to prove present or future dangerousness. Id. at 256, 261-62. None of this evidence established a specific act demonstrating a potentially serious likelihood of dangerousness. See id. at 261-62.

The only evidence of a specific act that had the potential to cause B.T. serious bodily injury was her overdose. Id. at 262. However, we held that her overdose had "insufficient probative value for determining her future dangerousness" because it was "neither recent nor similar to the events that gave rise to the petition." Id. Because there was no clear and convincing evidence of specific acts or actions demonstrating a potentially serious likelihood of dangerousness, we concluded that the court-appointed psychiatrist's expert opinion, alone, was insufficient to justify B.T.'s involuntary commitment. Id.

We apply similar reasoning in this case. In this case, the evidence was that the respondent lacks insight into her illness, denies the need for medication, and that, without medication, she experiences agitation, emotional

4

lability, and paranoid delusions. See id. at 261. However, as we explained in B.T., such evidence "may support a finding that [the respondent] suffers from a mental illness," but does "not make her 'dangerous' under RSA 135-C:34 to herself or to anyone else." Id. "These symptoms do not satisfy the specific acts or actions required to demonstrate a threat, a likelihood, an attempt, or an actual infliction of 'serious bodily injury' on herself or another." Id. (quotation omitted). Accordingly, we conclude that the respondent's symptoms are insufficient, as a matter of law, to prove by clear and convincing evidence that she poses a potentially serious likelihood of danger to herself or others. Id. at 261-62.

Similarly insufficient is evidence that the respondent repeatedly called the police, accused others because of her delusions, on one occasion attempted to confront a social worker, and, according to what she told a medical provider, was the subject of two protective orders because she followed her ex-husband and another man to their homes. As in B.T., the record in this case "reveals no likelihood of serious bodily injury caused" by these acts. Id. at 262. Therefore, evidence of these acts is also insufficient, as a matter of law, to prove by clear and convincing evidence that the respondent poses a potentially serious likelihood of danger to herself or others. Evidence that the respondent, at some point, violated the protective orders is likewise insufficient to establish her present or future dangerousness because there was no evidence as to when the protective orders were issued, when they were violated, and how they were violated.

Here, the only evidence of a specific act with the potential to cause serious bodily injury to either the respondent or others is that she once drove 20 miles over a 55-mile-per-hour speed limit while she was "on her smart phone" and was "driving past a big, brown truck" and experiencing delusions. However, there was no evidence as to when this incident occurred. Thus, it had "insufficient probative value for determining her future dangerousness." Id.

As in B.T., the opinions of the respondent's treating psychiatrist and the court-appointed psychiatrist that she poses a potentially serious likelihood of danger to herself or others due to her mental illness are insufficient, standing alone, to support her involuntary commitment. See id. As we explained in B.T., "a psychiatrist's finding of a dangerous mental condition does not automatically operate to trigger commitment; without evidence of dangerous conduct, even the most persuasive psychiatrist's report is insufficient to justify commitment." Id. (quotation omitted).

We reiterate that the respondent "cannot be deprived of her personal liberty by an involuntary commitment without clear and convincing proof of her dangerousness." Id. at 262-63. Thus, as we held in B.T., "[w]e hold that the

5

evidence submitted to the trial court was insufficient as a matter of law to support the finding of dangerousness" by clear and convincing evidence, and on that basis, we reverse the trial court's decision.  <u>Id</u>. at 263.

<u>Reversed</u>.


MACDONALD, C.J., and HICKS, BASSETT, and DONOVAN, JJ., concurred.