NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by email at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: https://www.courts.nh.gov/our-courts/supreme-court

THE SUPREME COURT OF NEW HAMPSHIRE

———————————————

2nd Circuit Court-Haverhill Probate Division
No. 2021-0525

IN RE G.W.

Argued: November 17, 2022
Opinion Issued: July 13, 2023

John M. Formella, attorney general, and Anthony J. Galdieri, solicitor general (Laura E. B. Lombardi, senior assistant attorney general, on the brief and orally), for the petitioner.

Amy B. Davidson, of Contoocook, on the brief and orally, for the respondent.

BASSETT, J. The respondent, G.W., appeals a decision of the Circuit Court (Rappa, J.) ordering her involuntary admission to the Secure Psychiatric Unit (SPU) of the New Hampshire State Prison for a period of three years with a conditional discharge when and if clinically appropriate. On appeal, G.W. challenges the sufficiency of the evidence supporting the trial court's conclusion that she met the involuntary admission standard. See RSA 135-C:34 (2021). She also argues that the court erred when it ordered that she remain in jail, where she had been detained on pending criminal charges, until a bed became available at the SPU. We affirm.

I. Factual and Procedural Background

The trial court found, or the record supports, the following facts. G.W. has, in her lifetime, received a variety of mental health diagnoses, including depression, post-traumatic stress disorder, and borderline personality disorder. In May and June 2019, G.W. was arrested on a number of criminal charges, including criminal threatening and violation of a protective order, based upon her conduct towards a man with whom she previously had a romantic relationship and that man's current partner (the complainants). G.W.'s conduct leading to her arrest included trespassing on the complainants' property, contacting them after a protective order was in place, placing two improvised explosive devices and one incendiary device in the complainants' vehicles, and making a bomb threat to the workplace of one of the complainants. Following her arrest, she was detained at the Grafton County House of Corrections (jail).

In 2020, the superior court found that G.W. was incompetent to stand trial on those charges and that her competency was not restorable. In July 2021, the superior court determined that G.W. was a danger to herself or others and ordered, pursuant to RSA 135:17-a, V (2021), that she remain in custody at the jail "for a period of 90 days to be evaluated for the appropriateness of involuntary treatment" under RSA 135-C:34. The Grafton County Attorney (the State) then filed a petition seeking the involuntary admission of G.W.

A court-appointed psychiatrist evaluated G.W. and issued a report to the court. See RSA 135-C:40 (2021). The examining psychiatrist opined that G.W. did not meet the legal standard for involuntary admission under RSA 135-C:34 because she was "not currently displaying signs and symptoms of an Axis I Mental Disorder" as defined in the applicable psychiatric diagnostic manual.

Following a three-day hearing on the petition in October 2021, the circuit court concluded that the State had met its burden under RSA 135-C:34 of proving by clear and convincing evidence that G.W. is "in such mental condition as a result of mental illness as to create a potentially serious likelihood of danger to herself or to others." (Brackets omitted.) The court acknowledged the examining psychiatrist's opinion to the contrary but stated that it was "expressly overrid[ing] that opinion pursuant to . . . RSA 135-C:45[,] I." It explained that, based upon G.W.'s behavior prior to and during her detention, "treatment other than involuntary admission . . . would not be in the best interest of [G.W.] and the community." Accordingly, the court ordered that G.W. be admitted to the New Hampshire Hospital for a period not to exceed three years with the potential for conditional discharge if and when clinically appropriate. It further ruled that "[u]ntil a bed becomes available at the New Hampshire Hospital [G.W.] shall continue to be detained at the Grafton County House of Corrections."

G.W. filed a motion to reconsider, which the court denied. New Hampshire Hospital intervened and also filed a motion to reconsider, requesting that the court order G.W. to be admitted to the SPU instead of New Hampshire Hospital. The court granted that request. The parties agree that G.W. was subsequently transferred from the jail to the SPU. This appeal followed.

II. Analysis

On appeal, G.W. claims that the trial court erred when it ordered: (1) G.W.'s involuntary admission based upon insufficient evidence that she met the admission standard; and (2) that G.W. remain in jail pending availability of a bed in the mental health services system. We address each argument in turn.

A. Sufficiency of the Evidence

The standard for determining whether a person should be admitted to a receiving facility for treatment on an involuntary basis is "whether the person is in such mental condition as a result of mental illness as to create a potentially serious likelihood of danger to [her]self or to others." RSA 135-C:34. To conclude that a respondent meets this standard, the court must find: (1) that the respondent has a "mental illness"; and (2) that the respondent is in such a mental condition as a result of that illness as to "create a potentially serious likelihood of danger to [her]self or to others." Id.; see also In re Sanborn, 130 N.H. 430, 445 (1988). G.W. argues that there was insufficient evidence for the court to make each of these predicate findings.

We review sufficiency of the evidence claims as a matter of law and uphold the trial court's findings and rulings unless they lack evidentiary support or are tainted by error of law. In re R.M., 172 N.H. 694, 698 (2019). The trial court's factual findings are final "unless they are so plainly erroneous that such findings could not be reasonably made." RSA 567-A:4 (2019); see R.M., 172 N.H. at 698. Accordingly, we do not reweigh the evidence to determine whether we would have ruled differently. R.M., 172 N.H. at 698. Instead, we review the record to determine if the trial court's findings could be reasonably made given the evidence before it. Id. We will uphold the court's decision to admit the respondent on an involuntary basis unless no rational fact finder could have made the findings supporting that decision by clear and convincing evidence. In re K.C., 175 N.H. 115, 118 (2022).

i. Sufficiency of Evidence of Mental Illness

G.W. first argues that the trial court's conclusion that she had a mental illness was tainted by an error of law. See R.M., 172 N.H. at 698. She contends that the court did not have authority under RSA 135-C:45, I (2021) to

3

override the expert's medical opinion on "the existence or absence of a mental illness." The State counters that RSA 135-C:45, I, "expressly authorizes the trial court to overrule the recommendation of the court-appointed psychiatrist" and that, for the purposes of RSA 135-C:34, whether G.W. has a mental illness is a legal — not a medical — determination to be made by the court. We agree with the State.

Resolving the parties' dispute requires us to interpret RSA 135-C:45, I. We review the trial court's interpretation of the statute de novo. Doe v. Comm'r, N.H. Dep't of Health & Human Servs., 174 N.H. 239, 247 (2021). When construing a statute, we first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning. Id. We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. Id. We construe all parts of a statute together to effectuate its overall purpose and to avoid an absurd or unjust result. Id. at 247-48.

As an initial matter, we observe that, for the purposes of RSA chapter 135-C, "mental illness" is defined, in relevant part, as "a substantial impairment of emotional processes, or of the ability to exercise conscious control of one's actions, or of the ability to perceive reality or to reason, when the impairment is manifested by instances of extremely abnormal behavior or extremely faulty perceptions." RSA 135-C:2, X (2021). Importantly, mental illness is not defined with reference to medical diagnostic criteria. Compare id., with RSA 171-B:2 (2022) (establishing involuntary admission standard for persons found not competent to stand trial under RSA chapter 171-B with reference to current edition of intellectual disability diagnostic manual). For the purposes of an involuntary admission proceeding, "mental illness" is ultimately a statutorily-defined legal concept. See RSA 135-C:2, X.

With this context in mind, we turn to the language of RSA 135-C:45. RSA 135-C:45, I, entitled "Order of Court," provides in relevant part:

> In hearings held under this chapter, after hearing all the evidence, the court may order the respondent to be released, notwithstanding expert testimony, or it may order the person to submit to some form of treatment other than inpatient treatment on an involuntary basis, which may include treatment at a community mental health program approved by the commissioner. If the examining psychiatrist recommends involuntary admission to a receiving facility as the most desirable form of treatment, the court may so order. . . . If the court determines that involuntary admission to a receiving facility is necessary, but the examining psychiatrist finds otherwise in his report under RSA 135-C:40, the court may overrule the recommendation of the psychiatrist only

4

> after the court finds that treatment other than involuntary
> admission to a receiving facility would not be in the best interests
> of the person and the community.

RSA 135-C:45, I (emphasis added). G.W. argues that this language does not give the trial court the authority to "overrule the examining psychiatrist's diagnostic conclusions as to the existence or non-existence of a mental illness," but, rather, assuming the psychiatrist has already found a mental illness, this language permits the trial court to overrule the psychiatrist's recommendation as to the appropriate treatment. We disagree.

As G.W. acknowledges, the statute provides that, should the court and the examining psychiatrist disagree as to whether involuntary admission is the most desirable form of treatment, the court's determination controls. See id.; see also In re Sandra H., 150 N.H. 634, 640-41 (2004) (concluding that, although expert recommended involuntary admission for one year, court could order admission for two years). Underlying both the court's and the expert's determinations about whether involuntary admission is the proper treatment are their respective threshold findings about whether the respondent meets the involuntary admission standard. See Sanborn, 130 N.H. at 445-46 (explaining that, because involuntary commitment involves a restriction of respondent's liberty, it is conditioned upon a finding that RSA 135-C:34 has been met by clear and convincing evidence). Accordingly, in order to have the power to overrule the expert's treatment recommendation under some circumstances, the court must have the concomitant authority to override the predicate findings underlying the expert's recommendation.

The language of the statute reflects this legislative intent. RSA 135-C:45, I, provides that, if the court finds that involuntary admission to a receiving facility is necessary but the expert determines otherwise, the "court may overrule the recommendation of the psychiatrist." RSA 135-C:45, I. In order to effectuate the legislative intent that the court be able to order the involuntary admission to and treatment in a receiving facility, despite an expert opinion that the involuntary admission standard has not been met and admission is unnecessary, the court must have the power to overrule the expert regarding the necessary threshold finding and conclude that the standard has been met. See id. Similarly, if an examining psychiatrist testifies that a respondent meets the involuntary admission standard and should be admitted to a receiving facility, the statute contemplates that the court may nevertheless conclude that the standard has not been satisfied and the respondent may therefore "be released." Id.

Moreover, neither RSA 135-C:45, I, nor any other provision of the statutory scheme, requires the court to defer to the opinion of the court-appointed psychiatrist on the issue of whether the involuntary treatment standard has been met, or with respect to the predicate findings of mental

illness and dangerousness. See RSA 135-C:40, :45. When the statute is read as a whole, it authorizes the court to overrule the expert's treatment recommendation, as well as the expert's threshold finding underlying the treatment recommendation: that the involuntary treatment standard has or has not been met. In short, RSA 135-C:45, I, recognizes the court's power — notwithstanding contrary expert testimony — to make the ultimate legal determination about whether the respondent meets RSA 135-C:34 and to order appropriate treatment in light of that determination.

This construction of the statute is consistent with our related case law. We have previously suggested, when addressing a prior version of RSA 135-C:45, I, with similar language, see RSA 135-B:37 (Supp. 1973) (repealed by Laws 1986, 212:4), that it is the judge, and not the psychiatrist, who determines whether the respondent has met the involuntary admission standard, see State v. Hudson, 119 N.H. 963, 967 (1979) (stressing that "it is the judge who makes the decision and not the psychiatrist" and observing that the prior version of this statute "empower[ed] the court to overrule the recommendation of [the] psychiatrist against involuntary commitment"); Dolcino v. Clifford, 114 N.H. 420, 421 (1974) ("It is clear that it is the judge of probate and not the medical experts who determines whether the [respondent's] liberty is to be curtailed.") (decided under prior statute); see also State v. Bertrand, 123 N.H. 719, 726 (1983) ("Competency to stand trial . . . is a legal, and not a medical, concept."). And we have held that the predicate finding of "dangerousness" is "not a medical concept, but rather a legal one." In re Fasi, a/k/a Cass, 132 N.H. 478, 484 (1989).

Given the plain language of RSA 135-C:45, I, the definition of "mental illness" in RSA 135-C:2, X, and our prior decisions, we hold that RSA 135-C:45, I, authorizes the trial court to overrule the opinion of the court-appointed psychiatrist regarding whether the standard for involuntary admission has been met, and, consequently, whether the prerequisites of a mental illness and dangerousness have been satisfied. Although the expert's opinion about whether the respondent has a mental illness is important in assisting the court in making its legal determinations under RSA 135-C:34 and in crafting its order under RSA 135-C:45, the expert's opinion is not, as G.W. contends, "dispositive." Accordingly, we conclude that the trial court did not err when it made the requisite additional finding under RSA 135-C:45, I, and overruled the expert's opinion that G.W. did not have a mental illness.

G.W. next argues that, even if the court could overrule the expert's opinion, there was insufficient evidence for the court to conclude that she had a mental illness. We disagree. We consider the evidence in light of the definition of mental illness set forth in RSA 135-C:2, X and focus our inquiry on evidence of G.W.'s "present mental condition." Fasi, 132 N.H. at 483.

G.W.'s treating psychiatrist testified that G.W.'s medical records demonstrate current diagnoses of post-traumatic stress disorder and borderline personality disorder. Based upon the treating psychiatrist's interactions with G.W. — one of which occurred days before his testimony — he testified that G.W.'s thought processes appeared "disorganized" and that "her presenting symptoms are consistent with" the diagnosis of borderline personality disorder. Additionally, during the two years of her detention, G.W. repeatedly requested and received psychiatric care, including prescription medication, for these and other mental health issues.

There is evidence upon which the court could have concluded that these emotional impairments manifested in extremely abnormal behavior. See RSA 135-C:2, X. The court heard testimony about G.W.'s many disciplinary issues at the jail requiring officers to use force, including two incidents when she attempted to bite the groin area of officers who were trying to restrain her.

Further, there is evidence in the record that G.W.'s emotional impairments rendered her unable to perceive reality, manifesting in "extremely faulty perceptions." Id. G.W. has a history of requesting psychiatric and medical appointments, refusing to attend them, and then later claiming that she has not received appropriate care. For example, at the hearing, G.W. filed a motion accusing the jail of failing to provide her prescribed medications for several days. In response, a nurse who is the medical coordinator at the jail testified that G.W. had refused one of her medications for thirty consecutive days in the month leading up to the hearing, and that, during that time frame, medical staff made three appointments for G.W. to see a psychiatrist to discuss her prescriptions, all of which G.W. refused to attend. Due to the extended period that G.W. had been off the medication, medical staff discontinued it until G.W. consulted with a psychiatrist. This evidence demonstrates that, at the time of the hearing, G.W. was under the extremely faulty perception that her lack of medication was due to mistreatment by jail staff, not her own choices and behavior. Based on this record, we conclude that there is sufficient evidence to support the court's finding, by clear and convincing evidence, that G.W. has a mental illness as defined in RSA 135-C:2, X.

ii.       Sufficiency of Evidence of Dangerousness

G.W. contends that, even if the court could conclude that she had a mental illness, there is insufficient evidence that her mental condition as a result of mental illness "create[d] a potentially serious likelihood of danger to [her]self or to others." RSA 135-C:34. The phrase "danger to [her]self or to others" means either "a threat of, a likelihood of, an attempt to inflict, or an actual infliction of serious bodily injury to oneself or another or a lack of capacity to care for one's own welfare such that there is a likelihood of serious debilitation if admission is not ordered." K.C., 175 N.H. at 118 (quotation omitted). Proof of mental illness alone is not sufficient, RSA 135-C:1, III (2021);

7

the petitioner must provide "clear and convincing proof of specific acts demonstrating actual or likely serious bodily injury." K.C., 175 N.H. at 118 (quotation omitted). This proof must establish the respondent's "current dangerousness" in the sense of a recent dangerous act. Id. "Although, in assessing present dangerousness, a court may, in its discretion, attach substantial weight to the evidence of past acts manifesting dangerousness, proof of past acts is not tantamount to proof of present dangerousness, and is not, accordingly, the touchstone for commitment." Id. (quotation omitted). "Rather, past acts merely help to predict the possibility of future dangerousness if they are sufficiently recent or sufficiently similar to the acts giving rise to the petition." Id. (quotation omitted).

Relying on In the Matter of B.T., 153 N.H. 255 (2006), G.W. argues that we should impose — in this involuntary non-emergency admission case — the 40-day limitation for determining whether past acts are sufficiently recent to support a finding of present dangerousness that applies in the emergency admission context. See RSA 135-C:27 (2021). To the extent that G.W. argues that we held in B.T. that the 40-day limitation in RSA 135-C:27 applies to non-emergency admissions, we disagree. Although in B.T. we looked to the definitions of "danger to himself" and "danger to others" in RSA 135-C:27 to define similar language in RSA 135-C:34, we did not hold, as G.W. asserts, "that the same criteria for dangerousness under RSA 135-C:27 appl[y] to both" emergency and non-emergency admissions. See B.T., 153 N.H. at 260-61. We concluded that some of the same criteria for dangerousness apply to both types of admissions. See id. We did not, however, interpret the phrase "danger to himself or to others" in RSA 135-C:34 as importing the 40-day limitation from RSA 135-C:27. See id. Nor did we conclude, in determining that the specific act underlying the petition in B.T. was too remote to support a finding of dangerousness, that the act was insufficiently recent because it occurred outside of a 40-day limitation period. See id. at 262. Accordingly, we are not convinced that B.T. supports application of a "bright-line rule" for determining whether specific acts are sufficiently recent to establish present dangerousness under RSA 135-C:34.

Nor are we persuaded by G.W.'s argument that the text of RSA 135-C:34 requires that we impose the 40-day limitation in non-emergency admission proceedings. Unlike RSA 135-C:27, RSA 135-C:34 does not set forth any time limitation for consideration of specific acts demonstrating dangerousness. Compare RSA 135-C:27, with RSA 135-C:34, and RSA 135-C:36, I(b) (2021) (requiring petition to allege "[t]he specific acts or actions that the petitioner alleges satisfy RSA 135-C:34" without specifying time frame for conduct). Had the legislature intended to impose such a time limit for non-emergency admissions, it would have done so. See RSA 135-C:27, I(a), II (40-day look back period for emergency admissions); see also Appeal of Roland, 170 N.H. 467, 470 (2017) ("If the legislature wanted to establish a mandatory timeframe, it knew how to do so.").

8

Additionally, this construction of the statute is consistent with the structure and overall purpose of the statutory scheme. See RSA 135-C:1, I(c) (2021) (purpose of RSA chapter 135-C is, in part, to "[p]revent mentally ill persons from harming themselves or others"); Doe, 174 N.H. at 247-48 ("We construe all parts of a statute together to effectuate its overall purpose and to avoid an absurd or unjust result."). Stricter time standards apply under RSA 135-C:27 than under RSA 135-C:34 because a proceeding under the former immediately deprives a person of her liberty, see Doe, 174 N.H. at 249-50, while the latter affords an evidentiary hearing before commitment, see RSA 135-C:43 (2021); RSA 135-C:45, I; see also In re Ronnie Prime, 120 N.H. 849, 851 (1980) (rejecting, under prior version of the statute, same argument G.W. now raises).

G.W. next contends that, even in the absence of a 40-day limitation, the evidence of her present dangerousness was inadequate because it was not recent enough and failed to demonstrate a serious likelihood of danger. With respect to the latter point, G.W. asserts that there is no proof that her conduct resulted in any actual harm. Proof of past infliction of actual harm is not, however, necessary. To show that a person is a danger to others requires proof of "a threat of, a likelihood of, an attempt to inflict, or an actual infliction of serious bodily injury" on another. K.C., 175 N.H. at 118 (quotation omitted). There is ample evidence in the record of G.W.'s attempts to harm others to prove that she is likely to inflict or attempt to inflict "serious bodily injury" on others if released. Id.

The chief of police, who participated in the investigation of G.W.'s alleged criminal conduct, testified that G.W. was arrested in May 2019 for placing two improvised explosive devices in the complainants' vehicles. Although neither device detonated or caused harm, one of the devices was capable of creating the chemical reaction necessary for an explosion. The chief of police testified that, had that device been constructed more effectively, it "could have very seriously hurt somebody" due to its potential to explode while someone was driving the vehicle. We are not persuaded by G.W.'s contention that eyewitness testimony was necessary to establish that she was the person who placed these devices. The chief of police testified at length about how he and other officers conducted the investigation and what evidence they collected, which led them to conclude that G.W. was responsible. The trial court found him credible and we owe deference to that factual finding. See R.M., 172 N.H. at 698.

Additionally, after her first arrest and release on bail, G.W. engaged in dangerous behavior. Despite a bail condition that she have no contact with the complainants, there was evidence that she placed an incendiary device in one of the complainants' vehicles. A week later, the police intercepted G.W. as she approached the complainants' house at night with several items that could be used to inflict serious bodily harm, including hypodermic needles, OxyContin, pliers, a box cutter, and a screwdriver. Notwithstanding the court-appointed

9

psychiatrist's ultimate conclusions to the contrary, her report stated that G.W.'s behavior towards the complainants "is concerning and presents a danger to" them.

There is also evidence establishing a serious likelihood that, if released, G.W. would continue this pattern of behavior. See Fasi, 132 N.H. at 485 (involuntary admission is ordered "not for what one has done, but for what one will do" (quotation omitted)). Despite her detention, G.W.'s fixation on the complainants did not cease. In 2020, she sent approximately eleven or twelve letters to individuals or entities connected to the complainants, or to the criminal charges, often in an attempt to communicate a message to the complainants. Further, there was substantial evidence that G.W. inconsistently took her psychiatric medications while detained. The court-appointed psychiatrist testified that G.W.'s inability to maintain consistent treatment in the structured jail environment indicated that she would likely inconsistently participate in treatment if released, which would be "dangerous." Based on this record, there is sufficient evidence to support the court's conclusion, by clear and convincing evidence, that G.W.'s mental condition as a result of mental illness posed a serious likelihood of danger to others.

Finally, G.W. argues that this evidence is insufficient to support her admission because the above specific acts of dangerousness did not occur sufficiently close in time to the petition for involuntary admission. Whether past conduct is sufficiently recent "depend[s] on the nature and circumstances of the act, the history of the person in question and the probative force of the other evidence adduced to prove dangerous propensity." Fasi, 132 N.H. at 485.

The primary acts of dangerousness alleged in the petition were G.W.'s alleged criminal conduct occurring in April, May, and June of 2019. Although these acts occurred well before the petition was filed in September 2021, G.W. continued to engage in similar conduct — despite her detention in jail. The record contains evidence that she was still attempting to contact the complainants while detained in 2020. Further, she attempted to inflict physical harm on others even while in the restrictive environment of the jail. For example, approximately six months prior to the filing of the petition, G.W. resisted and attempted to harm officers who were attempting to move her to a different unit. After officers had restrained G.W.'s feet and hands, she attempted to trip an officer, and, even after officers began carrying G.W. by her arms and legs, she attempted to bite an officer in the groin area. Whether or not this specific conduct rises to the level of an attempt to inflict "serious bodily injury," it suggests, when considered in context with G.W.'s pre-detention conduct, that if she were to be released to a less-restrictive environment, she would be likely to attempt to inflict serious bodily injury on others. See K.C., 175 N.H. at 118. Given these circumstances, we conclude that the evidence is sufficient to support the trial court's finding of current dangerousness.

10

In sum, we conclude that a rational fact finder could determine by clear and convincing evidence, as the trial court did, that G.W. has a mental illness and that she is in such a mental condition as a result of her illness as to create a potentially serious likelihood of danger to others. The trial court therefore did not err when it ordered that G.W. be involuntarily admitted to a receiving facility. See RSA 135-C:34.

B. Legality of Continued Detention at the Jail

G.W. also challenges the trial court's ruling that she continue to be detained at the jail until a bed became available at the SPU. She argues that there is no statutory authority that permitted the court to detain her in jail after it ordered her involuntary admission. She further contends that the court's order, which could have resulted in her indefinite confinement in jail, violated her due process rights. The State counters that this issue is moot because, within a month of the court's ruling, G.W. was transferred from the jail to the SPU. Nonetheless, G.W. urges us to decide the issue because it "involves a pressing public interest" and "presents an issue capable of repetition, yet evading review."

"[T]he question of mootness is one of convenience and discretion and is not subject to hard-and-fast rules." Appeal of Hinsdale Fed. of Teachers, 133 N.H. 272, 276 (1990) (quotation omitted). "Generally, however, a matter is moot when it no longer presents a justiciable controversy because issues involved have become academic or dead." Id. (quotation omitted). Because it is undisputed that G.W. has already been transferred out of the jail and into the SPU, we agree with the State that this issue is moot. We are not convinced that this case presents a sufficiently pressing issue of public interest or that it is capable of repetition yet evading review such that we should reach the merits. See id. We are mindful that there are likely to be material changes to New Hampshire's mental health services system in the coming year. See Doe v. Comm'r, N.H. Dep't of Health & Human Servs., ___ F. Supp. 3d ___, ____, Civil No. 18-cv-1039-LM, 2023 WL 2186458, at *5-8 (D.N.H. Feb. 23, 2023) (holding that Commissioner violated intervenor hospitals' Fourth Amendment rights by failing to expeditiously accept the transfer into designated receiving facilities of individuals involuntarily admitted on an emergency basis); Doe v. Comm'r, N.H. Dep't of Health & Human Servs., Civil No. 18-cv-1039-LM (D.N.H. May 17, 2023) (requiring that Commissioner comply within 12 months with permanent injunction enjoining violation of hospitals' rights).

III. Conclusion

We conclude that the trial court did not err when it ordered that G.W. be involuntarily admitted to the SPU under RSA 135-C:34. We do not reach the issue of whether the court erred when it ordered G.W. to remain at the jail pending bed availability at the SPU because that issue is now moot. Any

11

issues raised in the notice of appeal, but not briefed, are deemed waived.  <u>See</u> <u>State v. Blackmer</u>, 149 N.H. 47, 49 (2003).

<u>Affirmed</u>.

HICKS, HANTZ MARCONI, and DONOVAN, JJ., concurred.